Citation Nr: 1829756 
Decision Date: 07/27/18 Archive Date: 08/02/18

DOCKET NO. 04-31 184 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in White River Junction, Vermont


THE ISSUES

1. Entitlement to a rating in excess of 10 percent for reisudals of a traumatic brain injury (TBI) prior to October 23, 2008, in excess of 40 percent from October 23, 2008 to October 12, 2016, and in excess of 0 percent, effective October 12, 2016, forward, to include whether the reduction from 40 percent to non-compensable, effective October 12, 2016, was proper.

2. Entitlement to an initial rating in excess of 10 percent for dysthymic disorder and social phobia (acquired psychiatric disorders) prior to October 5, 2016, and in excess of 30 percent thereafter.

3. Entitlement to a rating in excess of 20 percent for posttraumatic seizure disorder with narcolepsy (a seizure disorder).

4. Entitlement to a compensable rating for rating left upper extremity weakness associated with status post craniotomy for subdural hematoma, left parietal region (left upper extremity weakness), prior to August 8, 2003, and in excess of 30 percent thereafter.

5. Entitlement to separate compensable rating for left lower extremity weakness associated with post traumatic seizure disorder with narcolepsy (left lower extremity weakness) prior to January 9, 2008, and a rating in excess of 20 percent thereafter. 

6. Entitlement to a separate compensable rating for a left hip disability, as a residual of TBI, prior to January 9, 2008, and a rating in excess of 10 percent thereafter.

7. Entitlement to a rating in excess of 10 percent for status-post craniotomy for subdural hematoma, left parietal region with nystagmus (nystagmus).

8. Entitlement to an initial rating in excess of 10 percent for visual field defects due to status post craniotomy for subdural hematoma, left parietal region (visual impairment).

9. Entitlement to an initial compensable rating for post-concussive headaches (headaches) and localized neuritic pain at the site of the craniotomy.


REPRESENTATION

Appellant represented by: Allen Grumpenberger, Agent


ATTORNEY FOR THE BOARD

M. Thomas, Associate Counsel


INTRODUCTION

The Veteran, who is the appellant in this case, served on active duty from May 1979 to February 1985.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from multiple rating decisions of the Department of Veterans Affairs (VA) Regional Offices (ROs) in Hartford, Connecticut and White River Junction, Vermont. Jurisdiction currently resides with the VA RO in White River Junction, Vermont.

In a December 2003 rating decision, the RO denied entitlement to a rating in excess of 20 percent for posttraumatic seizure disorder; a rating in excess of 10 percent for dementia due to head trauma; and a compensable rating for left upper extremity weakness. 

In an April 2010 rating decision, the RO, in pertinent part, granted service connection for left lower extremity weakness and assigned a 20 percent rating, effective January 9, 2008. 

In a June 2010 rating decision, the RO, in pertinent part, granted service connection for dysthymic disorder and assigned a 10 percent rating, effective January 9, 2008; granted a 40 percent rating for TBI with post concussive headaches and localized neuritic head pain, effective October 23, 2008; and denied a rating in excess of 10 percent for status post craniotomy for subdural hematoma, left parietal region.

In a March 2011 rating decision, the RO awarded a 30 percent rating for left upper extremity weakness, effective August 8, 2003.

In an October 2013 rating decision, the RO increased the rating for a craniotomy scar from noncompensable (0 percent) to 10 percent, effective December 27, 2011.

In May 2014, during the pendency of the present appeal, the RO awarded a separate 10 percent rating for a visual field defect due to status post craniotomy for subdural hematoma, left parietal region, effective July 2, 2009. 

In October 2016, the RO granted a separate noncompensable rating for post concussive headaches and localized neuritic head pain, effective October 12, 2016. The RO simultaneously reduced the Veteran's disability rating for a TBI from 40 percent to 0 percent, effective October 12, 2016. In addition, the RO granted a 30 percent rating for dysthymic disorder, effective October 5, 2016.

In November 2016, the RO granted service connection for narcolepsy, effective December 11, 2013, and rated it as part of the previously service connected post traumatic seizure disorder, which is part of the present appeal. 

As to the separate compensable ratings awarded during the pendency of the appeal for residuals of TBI that are listed on the title page, the Board finds that, to the extent that less than the maximum available benefit for a schedular rating was awarded and the separate ratings were not awarded for the entirety of the claims period, the claims remain before the Board. See Fenderson v. West, 12 Vet. App. 119, 126 (1999); AB v. Brown, 6 Vet. App. 35 (1993).

This appeal was previously remanded by the Board in May 2006 and July 2016. There has been substantial compliance with the Board's remand directives. Stegall v. West, 11 Vet. App. 268 (1998) (finding that a remand by the Board confers on the Veteran the right to compliance with its remand orders). 

The Board notes that service connection was granted during the pendency of this appeal for lumbosacral strain, left knee strain, right hip strain, and right ankle strain, all associated with the service-connected left lower extremity weakness as a residual of TBI. Service connection was also denied during the pendency of this appeal for erectile dysfunction, a left ankle condition, a bladder disorder, right lower extremity weakness, and temporomandibular joint disorder. Notice was provided and the decisions were not appealed. They thus became final. See 38 U.S.C. §§ 7103, 7104; 38 C.F.R. §§ 20.1100. Therefore, the Board does not have jurisdiction over these issues.

The Board considered whether an inferred claim for a total disability rating based on individual unemployability (TDIU) under Rice v. Shinseki, 22 Vet. App. 447 (2009) has been raised. Here however, the record indicates that the Veteran is gainfully employed. Although the Veteran reported having some issues at work related to his service-connected disabilities, these issues did not result in unemployment. In fact, the January 2013 VA mental disorders examination indicated that the Veteran had recently been promoted. Importantly, the Veteran does not assert the inability to maintain his current job due to service-connected disability. The Board therefore finds that Rice is inapplicable, and a TDIU request has not been inferred.

In April 2018, the Veteran requested that his appeal be transferred to VA's Rapid Appeals Modernization Program (RAMP). However, as this appeal had already been activated at the Board, it is not eligible for RAMP and the Board will proceed with a decision on the merits.


FINDINGS OF FACT

1. From October 12, 2016, the Veteran's residuals of TBI are not shown by a preponderance of the evidence to have improved under the ordinary conditions of work and life.

2. Prior to October 23, 2008, the Veteran's residuals of TBI manifested as dementia due to brain trauma and were characterized by occupational and social impairment with reduced reliability and productivity, but not occupational and social impairment with deficiencies in most areas or total occupational and social impairment.

3. From October 23, 2008, forward, the objective evidence shows that the Veteran's residuals of TBI were rated as "2" in one facet; the residuals of TBI were not shown to be rated as either "3" or "total" in one or more facets.

4. From October 23, 2008, the Veteran's acquired psychiatric disorders were characterized by occupational and social impairment with deficiencies in most areas, but not total occupational and social impairment.

5. Prior to August 13, 2010, the Veteran's seizure disorder with narcolepsy did not manifest in more than one major seizure in the last year or more than five minor seizures per week. 

6. From August 13, 2010 to October 2, 2013, the Veteran's seizure disorder with narcolepsy manifested in an average of at least five minor seizures per week, but not nine or more minor seizures per week or at least two major seizures in the last year. 

7. From October 3, 2013 to April 28, 2016, the Veteran's seizure disorder with narcolepsy manifested in more than 10 minor seizures weekly, but did not average at least one major seizure per month over the last year. 

8. From April 29, 2016, forward, the Veteran's seizure disorder with narcolepsy did not manifest in more than one major seizure in the last year or more than five minor seizures per week. 

9. For the entire period on appeal, the Veteran's left upper extremity weakness was characterized by moderate incomplete paralysis of the minor extremity, but not severe incomplete or complete paralysis.

10. For the entire period on appeal, the Veteran's left lower extremity weakness was characterized by moderately severe incomplete paralysis, but not severe incomplete or complete paralysis. 

11. For the entire period on appeal, the Veteran's left hip disability, as a residual of TBI, has resulted in painful, but otherwise non-compensable, motion; there has been no evidence of ankylosis, limitation of extension, impairment of the thigh, flail joint, or impairment of the femur.

12. The Veteran is in receipt of the maximum schedular rating for nystagmus under 38 C.F.R. § 4.79, Diagnostic Code (DC) 6016. 

13. For the entire period on appeal, the Veteran's bilateral visual field defect was characterized by an average concentric contraction of 52.375 degrees in the right eye and 51.625 degrees in the left eye. 

14. The currently assigned (separate) noncompensable rating for post-concussive headaches and localized neuritic head pain associated with the Veteran's TBI violates the anti-pyramiding provisions of 38 C.F.R. § 4.14.


CONCLUSIONS OF LAW

1. The reduction of the Veteran's disability rating for his TBI from 40 percent to non-compensable (zero percent) was not proper and the 40 percent rating is restored, effective October 12, 2016. 38 U.S.C. §§ 5107, 5112 (2012); 38 C.F.R. 
§§ 3.105, 3.344, 4.124a, DC 8045 (2017). 

2. For the entire period prior to October 23, 2008, the criteria for a rating of 50 percent, but no higher, for residuals of TBI, including dementia due to brain trauma, have been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.124a, DC 9304 (2008). 

3. From October 23, 2008, forward, the criteria for a rating in excess of 40 percent for residuals of TBI have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. 
§§ 3.102, 4.124a, DC 8045 (2017). 

4. From October 23, 2008, forward, the criteria for a rating of 70 percent, but no higher, for acquired psychiatric disorders have been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.130, DC 9433 (2017). 

5. Prior to August 13, 2010, the criteria for a rating in excess of 20 percent for a seizure disorder with narcolepsy, as a residual of TBI, have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 3.951(b), 4.124a, DC 8999-8914 (2017). 

6. From August 13, 2010 to October 2, 2013, the criteria for a rating of 40 percent, but no higher, for a seizure disorder with narcolepsy, as a residual of TBI, have been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.124a, DC 8999-8914 (2017). 

7. From October 3, 2013 to April 28, 2016, the criteria for a rating of 80 percent, but no higher, for a seizure disorder with narcolepsy, as a residual of TBI, have been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.124a, DC 8999-8914 (2017). 

8. From April 29, 2016, forward, the criteria for a rating of 20 percent, but no higher, for a seizure disorder with narcolepsy, as a residual of TBI, have been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 3.951(b), 4.124a, 
DC 8999-8914 (2017). 

9. Prior to August 8, 2003, the criteria for a rating of 30 percent, but no higher, for left upper extremity weakness, as a residual of TBI, have been met. 38 U.S.C. 
§§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.124a, DC 8512 (2017). 

10. From August 8, 2003, the criteria for a rating in excess of 30 percent for left upper extremity weakness, as a residual of TBI, have not been met. 38 U.S.C. 
§§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.124a, DC 8512 (2017). 

11. For the entire period on appeal, the criteria for a rating of 40 percent, but no higher, for left lower extremity weakness, as a residual of TBI, have been met. 
38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.124a, DC 8512 (2017). 

12. Prior to January 9, 2008, the criteria for a rating of 10 percent, but no higher, for a left hip disability, as a residual of TBI, have been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.40, 4.45, 4.59, 4.71a, DC 5252 (2017). 

13. From January 9, 2008, the criteria for a rating in excess of 10 percent for a left hip disability, as a residual of TBI, have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.40, 4.45, 4.59, 4.71a, DC 5252 (2017). 

14. The criteria for rating in excess of 10 percent for nystagmus, as a residual of TBI, have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.1, 4.2, 4.3, 4.7, 4.79, DCs 8045-6016 (2017).

15. The criteria for an initial rating in excess of 10 percent for a visual field defect, as a residual of TBI, have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 3.102, 4.1, 4.2, 4.3, 4.7, 4.79, DCs 6066-6080 (2017).

16. The criteria for a separate compensable rating for headaches and localized neuritic head pain, as a residual of TBI, have not been met. 38 U.S.C. §§ 1155, 5107 (2012); 38 C.F.R. §§ 4.1, 4.2, 4.7, 4.14, 4.124a, DCs 8045, 8100 (2017).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Preliminary Matter

The Board has limited the discussion below to the relevant evidence required to support its finding of fact and conclusion of law, as well as to the specific contentions regarding the case as raised directly by the Veteran and those reasonably raised by the record. See Scott v. McDonald, 789 F.3d 1375, 1381 (Fed. Cir. 2015); Robinson v. Peake, 21 Vet. App. 545, 552 (2008); Dickens v. McDonald, 814 F.3d 1359, 1361 (Fed. Cir. 2016).


Summary of the Relevant Evidence

A July 2001 VA neurology clinic note indicated that the Veteran had shooting head pain that lasted 20 to 30 seconds and occurred several times per day. The pain was sudden and short-lived.

A September 2003 VA rheumatology treatment note indicated that the Veteran had some residual weakness on the left side of his body from the subdural hematoma and surgery. He had left hip pain that was worse after sitting for some time, as well as significant pain with running, walking and riding a bike. X-rays revealed minimal degenerative changes (arthritis) to both hips. The treating physician opined that the Veteran's left hip pain was consistent with arthritis and likely exacerbated by his TBI.

The Veteran was afforded a VA mental disorders examination in September 2003. The Veteran was living with his second wife and worked full-time at a supervisory level. The Veteran reported having deficits related to language, with occasional word-finding difficulty. He also reported occasional short-term memory loss, such as not remembering what he ate for breakfast that day. The VA examiner noted that the Veteran appeared to have some mild loss of attention during the interview in terms of his losing his train of associations and forgetting the original question. On two occasions he said, "what was it that we were talking about?" There were no other signs of cognitive impairment through the interview. The Veteran had been employed in his current position for 14 years. He reported doing well in college. He described good relationships with his current wife and step-children. He described several hobbies and interests, including woodworking. He described an active social life. The VA examiner noted that the Veteran's most prominent symptoms were medical and neurological and not psychiatric, specifically ongoing seizures and head pain, as well as left-sided weakness. 

The Veteran was afforded a VA neurological disorders examination in September 2003. The Veteran reported having seizures only when falling asleep at night and consisting of a kind of tingling feeling of his head that got progressively more intense with a feeling of inability to move his muscles and yet they are involuntarily moving. When the seizure was over he would feel hot and achy all over. The Veteran stated that he was sometimes able to wake himself up when he started to fall asleep and have one of these spells and would get up and move around and do something else for a while, and sometimes they would not recur when he went back to bed. The Veteran's seizures were not controlled by medication, and he had one to two seizures per month. He also reported having sharp pains in his head that occurred two to four times a week without any obvious provocation. The Veteran reported feeling fatigued from all his medications. On examination, he had decreased muscle strength in the left extremities. Motor function and dep tendon reflexes were hyperactive on the left in the upper and lower extremity. His gait was somewhat awkward, favoring the left lower extremity. The VA examiner diagnosed left spastic hemiparesis, with greater deficits in the left lower extremity than in the upper extremity. 

A March 2006 VA neurology clinic note indicated that the Veteran was still having symptoms of seizures and head pain. He reported increased left hip pain due to chronic left-sided weakness following the TBI. He had a mild left limp. 

The Veteran was afforded a VA neurology examination in November 2006. He reported having 10 seizure episodes in the past 12 months, with the last episode two months prior. He reported that since avoiding falling asleep at the time of seizure activity, he had reduced the episodes from two to three times per month to 10 episodes in the past year. As to the left-sided hemiparesis, the Veteran reported that his left shoulder caused some discomfort, but less so than the left hip. The left shoulder was essentially asymptomatic in terms of joint complaints. He denied significant impact on his activities of daily living (ADLs) and job caused by the left shoulder weakness. The left hip pain had worsened. The Veteran is right hand dominant. Left hip flexion was 80 degrees, with pain at 60 degrees. Extension was 40 degrees, with pain at 30 degrees. Abduction was 60 degrees, with pain at 40 degrees. Adduction was 20 degrees, with pain at the end. Internal rotation was 30 degrees with pain throughout, and external rotation was 30 degrees with pain throughout. There was some weakness of the left upper nad lower extremities. The Veteran's gait was generally normal on regular walk, but he was unsteady on toe and heel rises and tandem walk. 

The Veteran was afforded a VA joint examination in March 2007. The Veteran reported having two seizures over the prior three months. He was otherwise able to abort the seizures by waking himself up prior to the seizure. He stated that the seizures did not affect his ability work, but that his head pain and residuals prior seizures affected his concentration while at work. He stated that the head pain stopped him from what he was doing for about 20 seconds, but was not prostrating. His seizures resulted in fatigue and some issues with concentration. He also reported generalized fatigue due to his numerous medications for his TBI-related conditions.

In July 2007, the Veteran was afforded a VA mental disorders examination. The Veteran reported some mild word finding difficulties, as well as difficulties with his attention and concentration at times. He reported few other significant cognitive deficits. The Veteran also reported having periods of "mood swings" in which he experienced some problems with his level of motivation, had little interest in leisure activities, became more isolated from others, and was dysphoric, though he reported no sleep or appetite disturbance. He also described some checking behavior and anxiety regarding promptness. He reported ongoing frustration with his physical limitations due to his left-sided weakness. He stated that he was unable to participate in sports and had difficulties working with his hands. The VA examiner opined that the Veteran's overall psychiatric symptoms appeared to be relatively mild and did not appear to impair his level of social or occupational functioning to any great extent. The Veteran had been married to his second wife for eight years and reported having good relationships with his wife and step-children. He also reported spending time with friends and in leisure activities with his family. He had been employed in the same position since 1989 and enjoyed his work. On examination, the Veteran's mood was mildly dysphoric. He reported mild difficulties with word finding and other mild cognitive complaints. The VA examiner diagnosed the Veteran with mild cognitive disorder not otherwise specified and a history of head trauma. A GAF score of 70 was assigned. 

A November 2007 private behavior health assessment note indicated that the Veteran reported having anger issues and being unable to maintain friendships. He had decreased energy and motivation. He denied active suicidal ideation, but had thoughts that it would be easier if he was not around. He had increased irritability. His concentration was poor and he was easily distracted.

A private behavioral health treatment record was received by VA in June 2008. The Veteran had been seeking private behavior health treatment since November 2007. He reported having long-standing issues with anger, causing him to become verbally loud and react by breaking various items. He reported that he was presently having increased stress from his job. The Veteran reported that he had been repressing his anger, was having difficulty in relationships, had decreased energy and motivation, had a moderate appetite, poor concentration and was easily distracted. He denied active suicidal ideation, but stated that he occasionally had thoughts about how easy it would be "to not be around." He reported having a strained relationship with his two brothers. He was diagnosed with dysthymic disorder.

The Veteran was afforded a VA examination in May 2009. The Veteran reported confusion if his usual routine was altered. He also reported a long history of pulsatile, sharp, intense headaches that lasted for about 20 seconds, without associated triggers or dysautonomia, and occurring about 12 times per month. He stated that he had to stop all activity during a headache and wait for it to pass. He reported that he had seizures that occurred only when he was falling asleep or tired, associated with an aura of abnormal tingling sensation throughout the scallop, and followed by a feeling of muscle contractions all over his body. He stated that he could abort a seizure if he got up and moved when he experienced the aura. He reported getting an aura three to four times a month, usually when falling asleep at night but over the last year the aura occurred during the day if he was tired. These daytime auras occurred three to four times a month. He had four to five true seizures over the past year that lasted 20 minutes each time and included pain, weakness, fatigue, and functional loss. The seizures did not affect his ability to work, but the head pain and any prior seizure affected his concentration while at work. He was hypersensitive to flashing lights. He had decreased strength and motor function throughout his left side. His gait was abnormal, with mild spasticity on the left side and decreased toe and heel walk on the left. The Veteran reported left hip with low grade daily pain and stiffness if he stayed in one position too long. His left hip hurt more if he walked a lot, went up and down stairs a lot, ran a lot, or played tennis for more than 30 minutes. The left hip pain lasted for one to two hours and resolved with rest. On examination, the Veteran had a very slight limping gait and no functional limitations on standing or walking. Left hip flexion was 110 degrees with pain at 90 degrees. Left hip extension was 30 degrees, with pain at that point. Adduction was 25 degrees and abduction was 45 degrees, both with pain at that point. External rotation was 60 degrees with pain at that point, and internal rotation was 40 degrees with pain at 30 degrees. There was also objective evidence of weakness and tenderness, but no additional loss of function or range of motion after three repetitions. The VA examiner opined that the left hip musculoskeletal strain was likely due to pain from overuse in a weaker extremity during activity. The gait abnormality was due to left side weakness that was likely due to the TBI with mild residual functional impairments. 

The Veteran was also afforded a VA mental disorders examination in May 2009. The Veteran reported experiencing ongoing seizures, headaches, dizziness, balance issues, hip pain, and a collapsing right ankle. He reported having poor impulse control, depression, and anger outbursts. He reported having some problems with motivation. He stated that these psychiatric symptoms had been present for about ten years. The Veteran reported some mild problems with memory, explaining that he would sometimes go into a room and not remember why he entered the room. The Veteran scored within the normal range on a cognitive function screening during the examination. He reported mild episodic depression that met the diagnostic criteria for dysthymic disorder. He stated that he had little motivation, anger, and sadness more than half the time over the past two years. He reported that he had felt this way since at least 1983. He also reported experiencing low energy, low self-esteem, and poor concentration. He had frequent panic attacks, often pertaining to anxiety about arriving at appointments late or when he had to make phone calls related to work. He would at times avoid social situations for fear of having a panic attack. He also reported compulsive checking behavior where he would check his alarm clock five times and check his front door five times. He explained that if he was involved in an activity and remembers he had not checked the alarm clock, he would stop what he was doing to go back to check it. He stated that he was obsessed with the number five. He reported that starting four years prior he would call out from work when he was feeling depressed, approximately seventeen times per year. He reported seeing flashes of light. He had arrived two hours early for the VA examination for fear that he would be late. The VA examiner diagnosed the Veteran with panic disorder with agoraphobia, dysthymic disorder, and obsessive-compulsive disorder. A GAF score of 68 was assigned. 

A May 2009 private behavioral health treatment note indicated that the Veteran reported noticing increased confusion, both in driving his car and functioning at work. The treating licensed clinical social worker noted that the Veteran appeared to be somewhat more depressed. 

A June 2009 VA neuropsychology testing consultation report indicated that the Veteran reported noticing changes in memory, reduced efficiency/planning, and word-finding problems. The executive problems were new since the last evaluation in 2007. The Veteran also reported an increase in anxiety and becoming more socially withdrawn. The Veteran arrived early for testing. His affect was normal. The Veteran's performance on tests of symptom validity suggested reduced/variable effort; therefore, his assessment results were not believed to be a credible indicator of his current neurocognitive status. Mood screening measures reflected scores in the range of moderate-severe anxiety and severe depression. 

A September 2009 VA psychiatry treatment note indicated that the Veteran had obsessions about whether he had left appliances on, had checking behaviors, and left home early for fear of being late. He reported starting multiple projects at once and could not finish them because he became overwhelmed. He reported that his seizure disorder was under fairly good control with two episodes monthly for several years. He had symptoms consistent with a mild to moderate depression. On examination, his affect was mildly constricted and his mood was described as "up and down."

An October 2009 VA psychiatry treatment note indicated that the Veteran's cognition and memory were grossly intact without deficits. His affect was mildly constricted and his mood was anxious. The psychiatrist indicated that it appeared that the Veteran's depressive symptoms and symptoms of obsessive-compulsive disorder (OCD) both began within two years of his head trauma during service, and that it appeared that both conditions are the result of his TBI. The Veteran's symptoms were described as essentially unchanged. A GAF score of 65 was assigned.

A November 2009 private behavioral health treatment note indicated that the Veteran reported being dizzy and frustrated. He reported being busy and stressed at work, causing him to become agitated and frustrated when his work is interrupted. He had difficulty recalling things and was easily confused. 

A December 2009 private podiatry treatment note indicated that the Veteran was having right ankle and foot issues. The right limb was longer than the left. The right foot was more dramatically pronated as compared to the left. The Veteran was a propulsive in gait. He did not have a heel to toe strike on the right lower extremity. The podiatrist opined that the Veteran's biomechanical problems were a direct result of the service-connected TBI.

A December 2009 private behavioral health treatment note indicated that the Veteran's mood was depressed and anxious, and his affect was constricted. He reported having frustration and anxiety in social situations. He continued to obsess prior to engaging in social situations and avoid going to social situations. He also reported increased depression.

In January 2010, the May 2009 VA examiner submitted an addendum opinion that considered the findings from the June 2009 VA neuropsychological evaluation. The VA examiner opined that, despite the new medical evidence, there were no changes to the diagnoses listed in the May 2009 VA examination report. 

In April 2010, the Veteran was afforded a VA TBI examination. The Veteran's head pain and headaches had not changed in frequency or severity. The Veteran reported experiencing confusion if things changed from his usual routine. There was objective evidence on testing of mild impairment of memory, attention, concentration, or executive functions resulting in mild functional impairment. 

In May 2010, the Veteran was afforded a VA eye examination. A mild nystagmus was noted. The Veteran reported sensitivity to sunlight. There was a mild nasal visual field restriction which the examiner opined was as likely as not related to the TBI. Corrected visual acuity was 20/40 or better bilaterally for both near and distance vision. Uncorrected visual acuity was 20/40 or better bilaterally for near vision. Uncorrected distance visual acuity was 20/200 bilaterally. No specific visual field restrictions were reported.

An August 2010 VA neurology treatment note indicated that the Veteran reported episodes of "tingling all over the head" which would progress to seizures (muscles would tighten up, would have difficulty breathing, would be unable to speak) if he was not able to stop them by getting up and walking around, eating, or drink. He reported that this happened about twice per month at night and this frequency had been stable. He also reported having these episodes during the day for the past three years, increasing in frequency over the past year. During the day, this feeling was brought on by fatigue while driving. He could have several of these episodes per week if he was driving a great deal. He continued to report shooting pains in his head which had occurred since the TBI and were stable. He also continued to report left-sided generalized muscle weakness and occasional paresthesias which had been stable since the TBI. 

A January 2011 VA mental health treatment note indicated that the Veteran was having some symptoms of anhedonia and amotivation. He felt best when he was alone because then he was not anxious. His checking behaviors had decreased, unless he had a change to his routine. He had an obsessive fear that he would drop his keys down a grate or get into a car crash. His cognition and memory were grossly intact without deficits. The Veteran's affect was full and his mood was anxious. He was depressed. A GAF score of 65 was assigned.

The Veteran was afforded a VA peripheral nerves examination in December 2012 to determine the severity of his left-sided weakness secondary to the TBI. He was noted to be right hand dominant. His muscle strength was decreased (4/5) in the left upper and lower extremities, but there was no muscle atrophy. His deep tendon reflexes were hyperactive without clonus (3+) in the left upper and lower extremities. Sensory testing was normal. The Veteran had difficulty with tandem walking. He favored his right side while walking, though this was more exaggerated with formal examination than with observation. The abnormal gait was due to left side weakness and pain. 

The Veteran was afforded a VA seizure disorders examination in December 2012. He was diagnosed with a focal sensory seizure disorder. He was unsure last time that he had a seizure, but thought it might be in 2011 or 2012. The Veteran reported that he had decreased grip in his left arm or hand. He was able to type, carry grocery bags, use his phone and hold a book with his left hand. He also reported having left hip pain that he attributed to his left-sided weakness. He had fallen nine times in the last year. 

A December 2012 VA neurology treatment note indicated that the Veteran reported having episodes while driving where he felt exhausted and "shaky," as well as experiencing head paresthesias. These typically happened on his drive home at the end of the day and were worse when he was tired. They occurred almost daily. He continued to have shooting head pains one to two times per week, and these pains could also be located in other parts of his body. 

In January 2013, the Veteran was afforded a VA mental disorders examination. He was diagnosed with dysthymic disorder. A GAF score of 61 was assigned. The VA examiner opined that it was not possible to separate the effects of dysthymia and TBI on the veteran's functioning because many of the symptoms, such as depressive thoughts, memory problems/reduced concentration, diminished interest and sleep issues, overlap. However, his symptoms of seizures and "head pain" were noted to be characteristics of TBI. The VA examiner opined that the Veteran had occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by medication. The Veteran reported continual anxiety in certain social situations, including at parties and in environments outside of his comfort zone. He reported that he mostly has worries and doubts when making plans for these events, anxious that he would be uncomfortable and with excessive worry, but felt guilty when he did not attend. However, he reported that when he did go to social gatherings he was able to relax after the initial jitters and enjoy himself. The Veteran reported that he frequented a familiar pub on a weekly basis and went out to dinners with his family. His leisure activities included watching television, watching sports, and going on local outings. He continued to be employed by the same employer and had recently received a promotion. He reported being anxious about his responsibilities. He denied having difficulty performing his job, but noted that his anxiety could be overwhelming and made him worried about the future. He was on psychotropic medications. His symptoms included depressed mood, anxiety, disturbances of motivation and mood, and difficulty in adapting to stressful circumstances, including work or a work-like setting. He also had difficulties maintaining attention and concentration for extended periods. A cognitive evaluation was performed, but was considered unreliable based on inconsistent performances on multiple measures of effort. However, the VA examiner concluded that at minimum, the Veteran's cognitive ability for naming, word fluency, simple construction, verbal abstract thinking, and problem solving were intact. Furthermore, the Veteran's performances on tasks of memory functioning for both verbal and nonverbal information in terms of learning, encoding, and recall were also intact and within the average range consistent with his estimated intellectual level. The Veteran reported subjective memory complaints, but was compensated well by self-initiated reminders, such as writing notes/lists and alerts by phone device.

The Veteran was afforded a VA TBI examination in February 2013. The examiner noted that the Veteran had noted episodes of alternation of consciousness while driving and was involved in a recent car accident. The Veteran denied having headaches, but reported having sharp head pain that lasted a few seconds and returned a few minutes later. Sometimes this pain was repetitive during the same day and sometimes it was noted four to five times in a month. He had occasional dizziness with seizures, fatigue, weakness and numbness of the left upper and lower extremities, forgot conversations, decreased attention and concentration, irritability, and blurred vision. He had normal balance and gait. He had subjective complaints of mild memory loss, attention, concentration, or executive functions, without objective evidence on testing. His motor activity was normal most of the time, but mildly slowed at times due to apraxia (inability to perform previously learned motor activities, despite normal motor function). He also had subjective symptoms of mild or occasional headaches and mild anxiety.

In September 2013, the Veteran was afforded a VA eye conditions examination. He was diagnosed with nystagmus and visual field defect, both secondary to the TBI. He reported stable bilateral photosensitivity. His corrected vision was 20/40 or better bilaterally for both near and distance. Uncorrected near visual acuity was 20/40 or better bilaterally. Uncorrected distance visual acuity was 20/200 in the right eye and 20/100 in the left eye. He had a loss of visual field, specifically bilateral nasal constriction. There was no change since the May 2010 VA eye examination. In the right eye, the meridians were as follows: 69 degrees temporally (16 degree loss); 65 degrees temporally down (20 degree loss); 57 degrees down (eight degree loss); 41 degrees down nasally (nine degree loss); 44 degrees nasally (16 degree loss); 50 degrees up nasally (five degree loss); 36 degrees up (nine degree loss); and 57 degrees up temporally (no loss, but two degree increase). The combined sum of the right eye meridians was 419, resulting in an average concentric contraction in the right eye of 52.375 degrees. In the left eye, the meridians were as follows: 44 degrees temporally (41 degree loss); 39 degrees temporally down (46 degree loss); 58 degrees down (seven degree loss); 68 degrees down nasally (no loss, but 18 degree increase); 75 degrees nasally (no loss, but 15 degree increase); 50 degrees up nasally (five degree loss); 31 degrees up (14 degree loss); and 48 degrees up temporally (seven degree loss). The combined sum of the left eye meridians was 413, resulting in an average concentric contraction in the left eye of 51.625 degrees. 

In September 2013, the Veteran was afforded a VA scars examination. A craniotomy scar was noted. The Veteran reported numbness in the area of the original surgery, likely due to superficial sensory nerve disruption. There were no functional limitations or disfigurement. The scar is barely visible and is hidden by his hair. It is an L-shaped scar, 17 cm in length and 0.5 cm in width. There is no elevation, depression, adherence to underlying soft tissue, or missing underlying soft tissue. However, the scar is hypopigmented in a total area of 8.5 squared cm. There is no functional impact of the scar.

An October 2013 VA discharge summary indicated that the Veteran was last seen in the seizure clinic in June 2013, when he complained of "drifting" in his car while driving, staring and not being conscious of what is going on until he hits the rumble strips on the side of the road. On admission, the Veteran stated that he felt a tingling within his head, at which point it felt like he was falling asleep and becoming unaware of his surroundings. He stated that he would then blackout and just stare. He stated that these episodes occur every day while driving, occurring twice a day (on the way to and from work). He commuted over 100 miles per day. The last episode was a week earlier on his way to work. The Veteran reported that he did not sleep well, but had not noticed a correlation between fatigue and seizure frequency. The Veteran also stated that he had sleep-associated seizure activity, which he described as a sensation of "hot snaps and popping" inside his head as he was falling asleep, followed by all his muscles contracting, including his jaw clenching. He stated that he was conscious of these events, but unable to move. These episodes lasted 20 to 30 minutes and he would feel sore after his muscles relaxed. He was able to recognize when these episodes are about to occur by identifying the "hot snap" sensation, and would get out of bed and move around, which can prevent the episode from progressing. The Veteran stated that he had not had the muscle contractions in years. 

A November 2013 VA sleep medicine note indicated that the Veteran complained of fatigue following a sleep study that did not support sleep disordered breathing. The Veteran reported experiencing significant sleepiness during his long daily commute. These symptoms started five to seven years ago and had built over the years. He stated that he was tired all the time. He had a motor vehicle accident due to falling asleep at the wheel.

An April 2014 VA mental health treatment note indicated that the Veteran had been doing more compulsive behaviors attributed to stress. He had some obsessional thinking, but less so than the compulsions. He denied that the compulsions were interfering with activities. He was sometimes depressed. The Veteran's affect was constricted and his mood was "stressed." A GAF score of 65 was assigned. 

In January 2015, the Veteran was afforded a VA headaches examination. He experienced headache pain on both sides of his head that lasted less than one day. The Veteran did not have characteristic prostrating attacks of migraine/non-migraine headache pain. 

In January 2015, the Veteran was afforded a VA TBI examination. The VA examiner opined that the Veteran's events where he had an abnormal sensation in his head and then bilateral upper and lower extremity paralysis while going to sleep were more consistent with sleep paralysis than seizures. The Veteran had mild weakness of the left side with a component of break-away weakness, but exhibited fine motor dexterity and was able to perform all activities of daily living (ADLs), instrumental activities of daily living (IADLs), and work independently. Diagnoses of OCD (secondary to TBI), depression not otherwise specified (NOS), narcolepsy, simple partial seizures, and left-sided hemiplegia were noted. The Veteran complained of holocephalic headache occurring three times per week and lasting for a few minutes. He also reported symptoms of anxiety, particularly about time and getting things done. He reported problems with short-term memory, particularly when he has too many things going on as gets anxious and cannot concentrate. As to the facets of TBI-related cognitive impairment, the Veteran had a complaint of mild memory loss, attention, concentration, or executive functions, but without objective evidence on testing. Judgment was normal. Social interaction was routinely appropriate. He was always oriented to person, time, place, and situation. Motor activity was normal. Visual spatial orientation was normal. The Veteran's subjective symptoms included anxiety. He had a neurobehavior effect, in that he used to be more irritable and angry, but this was now better controlled by medication. He could communicate by and comprehend spoken and written language. His consciousness was normal. The Veteran had a scar, but it was not painful, unstable, or of a total area of greater than 39 square centimeters. The VA examiner opined that due to the Veteran's seizures and chronic headaches which are a result of his moderate TBI, he has trouble maintaining employment as he either had to take time off for his headache or he had to avoid certain activities which may cause increase risk for fall from seizure. The Veteran complained of headaches occurring three times a week that the VA examiner opined were at least as likely as not caused by the moderate TBI. The VA examiner further opined that the Veteran's memory difficulties were less likely related to his TBI as they occurred many years after the head trauma and appeared to be more likely related to his anxiety as his memory problems occur in a setting of anxiety and trouble with concentration. The VA examiner also opined that the Veteran's trouble with concentration, irritability and anger were all more likely than not related to his anxiety. 

An April 2016 VA neurology treatment note indicated that the Veteran had diagnoses of simple partial seizure disorder and narcolepsy. The Veteran stated that his seizure disorder was well controlled. He occasionally had episodes of numbness/tingling at night, however this resolved when he got up and walked around. He stated that these episodes had become relatively infrequent, with the last episodes occurring about two months prior. The neurologist stated that these episodes were possibly secondary to simple partial seizures versus sleep paralysis. As to the narcolepsy, the Veteran stated that he still felt persistently tired throughout the day. He would sometimes fall asleep at his desk at work. He pulled over and walked around when he felt tired while driving. He slept about seven hours per night. He felt more short-tempered and had difficulty concentrating when he felt stress/anxiety. The Veteran reported sometimes getting lost driving in his own neighborhood and recently left his car key in the ignition.

In October 2016, the Veteran was afforded a VA mental disorders examination. He reported symptoms of depressed mood, anxiety (particularly in social settings), and mild cognitive problems which he found very frustrating. He was diagnosed with persistent depressive disorder and generalized anxiety disorder. The VA examiner opined that the Veteran's mental diagnoses caused occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by medication. The VA examiner stated that the Veteran's primary complaints about work functioning relate to disorganization and memory problems, which may relate more to the TBI, but he then becomes very frustrated with this, which may relate more to his psychiatric diagnoses. Thus, impairment was likely due to a combination of all diagnoses. The Veteran was separated from his wife, but reported good relationships with his two adult stepchildren. His leisure activities were minimal, partly due to having trouble thinking about what to do with his time. He had not made close local friends, but continued to drive to see friends from other parts of the state. He would like to make local friends, but felt anxious about the social process. He would sometimes cancel social plans due to anxiety, followed by relief, then regret. He remained employed full time in his job of 28 years. He was in a supervisory role and had a good reputation at work. He reported that his depression did not affect his job, though he would sometimes have trouble focusing, which then led to overwhelming anxiety. He felt overwhelmed from monitoring details at work and would leave early with the intention to finish his work at home. He easily lost his train of thought, which impacted him when doing public speaking. His organizational skills on his computer frustrated him. His psychiatric symptoms included depressed mood, anxiety, panic attacks that occur weekly or less often, impaired short- and long-term memory, disturbances of motivation and mood, and difficulty in adapting to stressful circumstances. The Veteran did not report OCD symptoms and the VA examiner noted that these may be managed by medication.

In October 2016, the Veteran was afforded a VA narcolepsy examination. He was diagnosed with narcolepsy in 2012. The narcolepsy was controlled by continuous medication. He had symptoms of excessive daytime sleepiness, sleep attacks, and sleep paralysis. He had zero to one narcoleptic episodes over the past six months. 

In October 2016, the Veteran was afforded a VA headaches examination. He was diagnosed with tension headaches that caused sharp pain on both sides of the head and lasted less than one day. He did not have characteristic prostrating attacks of migraine/non-migraine headache pain. The Veteran's headache condition did not impact his ability to work.

In October 2016, the Veteran was afforded a VA TBI examination. The Veteran reported having headaches twice per week around the crown where he had surgery, but they could also be on the right side of his head. He reported trouble with narcolepsy for the past 10 years. He passed out when driving about four years prior and hit a trailer. He passes out at times in the office. He reported difficulty with short-term memory for the past few years and it had become worse in the past year. His memory was worse when he had too many things going on, because he became anxious and could not concentrate. He was anxious about time and getting things done. He continued to be irritable and angry. Neuropsychological testing had been performed in January 2016. The Veteran's scores on measures of performance validity suggested that the evaluation may not have been representative of his best performance. The evaluating physician opined that given the current level of distress that the Veteran endorsed, it was likely that his psychiatric conditions were impeding his ability to fully engage in the testing. Other potential factors that may have interfered with the Veteran's performance included pain and sleep difficulties. The VA examiner opined that the Veteran's residuals of a TBI did not impact his ability to work. The VA examiner attributed the Veteran's symptoms of memory difficulties, impaired concentration, irritability, and anger to his psychiatric disabilities and not his TBI.

In November 2016, the Veteran was afforded a VA peripheral nerves conditions examination. The VA examiner opined that the Veteran's symptoms of mild upper and lower extremity weakness, secondary to the TBI, had not changed since the 2012 VA examination.


Rating Reduction - Applicable Laws, Regulations, and Analysis

The Veteran asserts that the RO's reduction in the rating assigned for his residuals of TBI from 40 percent to noncompensable, effective October 12, 2016, was improper.

In a rating reduction, not only must it be determined that an improvement in a disability has actually occurred, but also that the improvement actually reflects an improvement in a veteran's ability to function under the ordinary conditions of life and work. Brown v. Brown, 5 Vet. App. 413, 420-21 ; Schafrath v. Derwinski, 1 Vet. App. 589, 594 (1991). 

The provisions of 38 C.F.R. §§ 4.1, 4.2, and 4.10 require that a reduction in rating be based upon review of the entire history of a veteran's disability. VA must then ascertain whether the evidence reflects an actual change in the disability and whether the examination reports reflecting such change are based on thorough examinations. Faust v. West, 13 Vet. App. 342 (2000). VA is not limited, however, to medical indicators of improvement. Rather, VA may rely on non-medical indicators of improvement to show that a veteran is capable of more than marginal employment. Id. The examination reports on which the reduction is based must be adequate. See Tucker v. Derwinski, 2 Vet. App. 201 (1992) (holding that the failure of the examiner in that case to review the claims file rendered the reduction decision void ab initio). 

In addressing whether improvement is shown, the comparison point generally is the last examination on which the rating at issue was assigned or continued. See Hohol v. Derwinski, 2 Vet. App. 169 (1992). Where, however, the rating was continued in order to see if improvement was in fact shown, the comparison point could include prior examinations as well. Collier v. Derwinski, 2 Vet. App. 247 (1992). 

Specific requirements must be met in order for VA to reduce certain ratings assigned for service-connected disabilities. See 38 C.F.R. § 3.344; see also Dofflemyer v. Derwinski, 2 Vet. App. 277 (1992). The requirements for reduction of ratings in effect for five years or more are set forth at 38 C.F.R. § 3.344(a) and (b), which prescribe that only evidence of sustained material improvement under the ordinary conditions of life, as shown by full and complete examinations, can justify a reduction; these provisions prohibit a reduction on the basis of a single examination. See Brown, 5 Vet. App. at 417-18. Where doubt remains, the rating agency will continue the rating in effect, and consider scheduling reexamination 18, 24, or 30 months later. 38 C.F.R. § 3.344(b). Where a rating reduction was made without observance of law, the reduction must be vacated and the prior rating restored. Schafrath, 1 Vet. App. at 595. 

In determining whether the reductions were proper in this case, the Board must focus upon the evidence available to the RO at the time the reduction was effectuated, although post-reduction medical evidence may be considered in the context of evaluating whether the disability had actually improved. Cf. Dofflemyer, 
2 Vet. App. at 281-282. Such after-the-fact evidence may not be used to justify an improper reduction.

Here, the RO in a June 2010 rating decision awarded a 40 percent rating under 38 C.F.R. § 4.124a, DC 8045, for residuals of TBI, effective October 23, 2008, based on cognitive impairment with objective evidence on testing of mild impairment of memory, attention, concentration, or executive functions resulting in mild functional impairment. 

In an October 2016 rating decision, the 40 percent rating was reduced to a non-compensable rating, effective October 12, 2016. It is undisputed that the Veteran's 40 percent disability rating was continuous for over 5 years. In addition, the reduction did not result in a reduction in the Veteran's overall compensation.

After a review of the evidence of record, the Board finds that VA has not met its burden, as the preponderance of the evidence does not show improvement in the Veteran's residuals of TBI. In so finding, the Board emphasizes that DC 8045 explicitly states that "in a given individual, symptoms [of cognitive impairment] may fluctuate in severity from day to day." Thus, a reduction could not be based on any particular piece of evidence, but must be based on an overarching picture of improvement that considers the evidence of record over an extended period. 

Importantly, the Veteran's TBI is rated under DC 8045 and under such code, there are three main areas of dysfunction that may result from a TBI and have profound effects on functioning: cognitive (which is common in varying degrees after a traumatic brain injury), emotional/behavioral, and physical. Each of these areas of dysfunction may require evaluation. See 38 C.F.R. § 4.124, DC 8045.

The April 2010 VA examination report indicated that there was objective evidence on testing of mild impairment of memory, attention, concentration, or executive functions resulting in mild functional impairment. A January 2011 VA treatment note indicated that the Veteran's cognition and memory were grossly intact without deficits. The January 2013 VA examination report indicated that a cognitive evaluation was performed, but was considered unreliable based on inconsistent performances on multiple measures of effort. A February 2013 VA TBI examination report indicated that the Veteran had subjective complaints of mild impairment of memory, attention, concentration, or executive functions, without objective evidence on testing. A January 2013 VA TBI examination report indicated that the Veteran had subjective complaints of mild impairment of memory, attention, concentration, or executive functions, without objective evidence on testing. The October 2016 VA examination report indicated that neuropsychological testing had been performed in January 2016, but the Veteran's scores on measures of performance validity suggested that the evaluation may not have been representative of his best performance and it was likely that the Veteran's service-connected psychiatric conditions, pain and sleep difficulties were impeding his ability to fully engage in the testing. In addition, the Board notes that the Veteran has consistently reported symptoms of impairment of memory, attention, concentration, or executive functions throughout the period on appeal, despite the inconsistency of the objective testing. For these reasons, and resolving all reasonable doubt in the Veteran's favor, the Board finds that improvement of the Veteran's TBI had not been shown by the preponderance of the evidence. Accordingly, restoration of the 40 percent rating, effective October 12, 2016, is warranted. 38 U.S.C. § 1155; 38 C.F.R. §§ 3.105, 4.124a, DC 8045 (2017). 


Increased Ratings - Laws and Regulations

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities (rating schedule), found in 38 C.F.R. Part 4. Disability ratings are intended to compensate impairment in earning capacity due to a service-connected disability. 38 U.S.C. § 1155 (2012). Evaluation of a service-connected disability requires a review of the Veteran's entire medical history regarding that disability. 38 C.F.R. §§ 4.1, 4.2 (2017); Schafrath v. Derwinski, 1 Vet. App. 589 (1991). After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the Veteran. See 38 C.F.R. § 4.3.

The Board will consider whether separate ratings may be assigned for separate periods of time based on facts found, a practice known as "staged ratings," whether it is an initial rating case or not. Fenderson v. West, 12 Vet. App. 119, 126-27 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007).

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2017). Any reasonable doubt regarding a degree of disability will be resolved in favor of the veteran. 38 C.F.R. § 4.3 (2017).

The assignment of a particular diagnostic code is "completely dependent on the facts of a particular case." Butts v. Brown, 5 Vet. App. 532, 538 (1993). One diagnostic code may be more appropriate than another based on such factors as an individual's relevant medical history, the diagnosis, and demonstrated symptomatology. Any change in a diagnostic code by a VA adjudicator must be specifically explained. Pernorio v. Derwinski, 2 Vet. App. 625, 629 (1992).

In general, all disabilities, including those arising from a single disease entity, are rated separately, and all disability ratings are then combined in accordance with 38 C.F.R. § 4.25. Pyramiding, the evaluation of the same disability, or the same manifestation of a disability, under different diagnostic codes, is to be avoided when rating a Veteran's service-connected disability. 38 C.F.R. § 4.14. It is possible for a Veteran to have separate and distinct manifestations from the same injury which would permit rating under several diagnostic codes, however, the critical element in permitting the assignment of several ratings under various diagnostic codes is that none of the symptomatology for any one of the conditions is duplicative or overlapping with the symptomatology of the other condition. See Esteban v. Brown, 6 Vet. App. 259, 261-62 (1994). 

In rendering a decision on appeal, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material favorable to the claimant. Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994); Gilbert v. Derwinski, 1 Vet. App. 49, 57 (1990). Competency of evidence differs from weight and credibility. Competency is a legal concept determining whether testimony may be heard and considered by the trier of fact, while credibility is a factual determination going to the probative value of the evidence to be made after the evidence has been admitted. Rucker v. Brown, 10 Vet. App. 67, 74 (1997); Layno v. Brown, 6 Vet. App. 465, 469 (1994). 

When considering whether lay evidence is competent, the Board must determine, on a case-by-case basis, whether a veteran's particular disability is the type of disability for which lay evidence may be competent. Kahana v. Shinseki, 24 Vet. App. 428 (2011); see also Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007). A veteran is competent to report symptoms because this requires only personal knowledge, not medical expertise, as it comes to her through her senses. See Layno, 6 Vet. App. 465, 469. Lay testimony is competent to establish the presence of observable symptomatology, where the determination is not medical in nature and is capable of lay observation. Barr v. Nicholson, 21 Vet. App. 303 (2007). Lay evidence may establish a diagnosis of a simple medical condition, a contemporaneous medical diagnosis, or symptoms that later support a diagnosis by a medical professional. Jandreau, 492 F.3d 1372, 1377.

When all the evidence is assembled, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with a veteran prevailing in either event, or whether a preponderance of the evidence is against a claim, in which case, the claim is denied. 38 U.S.C. § 5107 (b) (2012); 38 C.F.R. § 3.102 (2017).


Increased Rating for Residuals of a TBI - Analysis

The Veteran is seeking an increased rating for residuals of a TBI. He is currently service connected, in pertinent part, for the following disabilities: (1) residuals of a TBI, rated 10 percent from July 6, 2000 to October 22, 2008, 40 percent from October 23, 2008 to October 11, 2016, and zero percent thereafter, under 38 C.F.R. § 4.124a, Diagnostic Code 8045, applicable to residuals of TBI; (2) posttraumatic seizure disorder with narcolepsy, rated 20 percent from February 13, 1985 under 
38 C.F.R. § 4.124a, Diagnostic Code 8999-8914, applicable to psychomotor epilepsy; (3) status-post craniotomy for subdural hematoma, left parietal region, with nystagmus, rated 10 percent from February 13, 1985 under 38 C.F.R. 
§§ 4.124a, 4.79, Diagnostic Codes 8045 and 6016, applicable to residuals of TBI and central nystagmus; (4) left upper extremity weakness as a residual of TBI, rated zero percent from August 3, 2000 to August 7, 2003 and 30 percent thereafter, under 38 C.F.R. § 4.124a, Diagnostic Code 8512, applicable to paralysis of the lower radicular group; (5) left lower extremity weakness as a residual of TBI, rated 20 percent from January 9, 2008 under 38 C.F.R. § 4.124a, Diagnostic Code 8520, applicable to paralysis of the sciatic nerve; (6) dysthymic disorder and social phobia, rated 10 percent from January 9, 2008 to October 4, 2016, and 30 percent thereafter, under 38 C.F.R. § 4.130, Diagnostic Code 9433, applicable to persistent depressive disorder; (7) a visual field defect as a residual of TBI, rated 10 percent from July 2, 2009 under 38 C.F.R. 4.79, Diagnostic Codes 6066-6080, applicable to impaired visual acuity and visual field defects; (8) a craniotomy scar, rated 0 percent from February 13, 1985 to December 26, 2011, and 10 percent thereafter, under 38 C.F.R. § 4.118, Diagnostic Code 7800, applicable to head scars; and (9) post concussive headaches and localized neuritic head pain at the site of the craniotomy, rated 0 percent from October 12, 2016 under 38 C.F.R. § 4.124a, Diagnostic Code 8100, applicable to migraines. Each of these disabilities is a residual of TBI. As all of the disabilities at issue in this appeal are residuals of TBI, the Board will consider them both together and separately in order to assign the highest possible combined rating. 

The criteria for rating TBI were revised during the pendency of this appeal. See 73 Fed. Reg. 54693 (Sept. 23, 2008). The effective date for these revisions is October 23, 2008. See 38 C.F.R. § 4.124, Note (5). For claims received by VA prior to that effective date, a veteran is to be rated under the old criteria, but under the new criteria or the old criteria, whichever are more favorable, for the period beginning on October 23, 2008. Therefore, the Board will separately consider the claim for an increased rating for residuals of TBI for the periods before and after October 23, 2008.

a. Residuals of TBI Prior to October 23, 2008 

Prior to October 23, 2008, the Veteran was in receipt of a 10 percent rating for residuals of TBI under 38 C.F.R. § 124, Diagnostic Code 8045. He contends that a higher rating is warranted.

Prior to October 23, 2008, Diagnostic Code 8045 provided that purely neurological disabilities such as hemiplegia, epileptiform seizures, facial nerve paralysis, etc., following trauma to the brain, will be rated under the diagnostic codes specifically dealing with such disabilities, with citation of a hyphenated diagnostic code (e.g., 8045-8911). Purely subjective complaints such as headaches, dizziness, insomnia, etc., recognized as symptomatic of brain trauma, will be rated 10 percent and no more under Diagnostic Code 9304. This 10 percent rating will not be combined with any other rating for a disability due to brain trauma. Ratings in excess of 10 percent for brain disease due to trauma under Diagnostic Code 9304 are not assignable in the absence of a diagnosis of multi-infarct dementia associated with brain trauma. 38 C.F.R. § 4.124a, Diagnostic Code 8045 (as in effect prior to October 23, 2008). As the Veteran is in receipt of the maximum schedular rating under DC 8045, no further discussion of this diagnostic code is warranted.

However, the September 2003 VA examination report indicated that the Veteran had been diagnosed with dementia due to brain trauma. Therefore, the Board will consider whether a rating in excess of 10 percent under 38 C.F.R. §4.130, DC 9304, applicable to dementia due to brain trauma, is warranted. 

All psychiatric disabilities are evaluated under a general rating formula for mental disorders. A 30 percent rating is warranted for occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as de-pressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, and mild memory loss (such as forgetting names, directions, and recent events).

A 50 percent rating is warranted for occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short-and long-term memory (e.g. retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing effective work and social relationships.

A 70 percent rating is warranted when the psychiatric disorder results in occupational and social impairment with deficiencies in most areas such as work, school, family relations, judgment, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such an unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work like setting); and inability to establish and maintain effective relationships.

A total schedular rating of 100 percent is warranted when the disorder results in total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (ADLs) (including maintenance of mental and personal hygiene); disorientation to time or place; and memory loss for names of close relatives, own occupation, or own name.

Effective August 4, 2014, VA amended the portion of the Rating Schedule dealing with mental disorders and its adjudication regulations that define the term "psychosis" to remove outdated references to the DSM-IV and replace them with references to the updated Fifth Edition (DSM-5). See 79 Fed. Reg. 149, 45094. The provisions of the interim final rule apply to all applications for benefits that are received by VA or that were pending before the Agency of Original Jurisdiction on or after August 4, 2014. Id. VA adopted as final, without change, the interim final rule and clarified that the provisions of this interim final rule do not apply to claims that have been certified for appeal to the Board or are pending before the Board as of August 4, 2014. See 80 Fed. Reg. 53, 14308 (March 19, 2015). Here, the RO certified the Veteran's appeal to the Board prior to August 4, 2014; therefore, the PTSD claim is governed by DSM IV and the GAF scores are relevant for consideration.

GAF scores ranging between 61 and 70 reflect some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, and has some meaningful interpersonal relationships. See Diagnostic and Statistical Manual for Mental Disorders, Fourth edition, p. 46 (1994). 

Scores ranging from 51 to 60 reflect more moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id. at p. 47. 

Scores ranging from 41 to 50 reflect serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Id. 

Scores ranging between 31 and 40 are assigned when there is some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). Id.

In reviewing the evidence of record, the Board will consider the assigned GAF score; however, the Board is cognizant that GAF scores are not, in and of themselves, the dispositive element in rating a disability. Rather, GAF scores must be considered in light of the actual symptoms of the Veteran's disorder, which provide the primary basis for the rating assigned. See 38 C.F.R. § 4.126(a).

When evaluating mental health disorders, the factors listed in the Rating Schedule are simply examples of the type and degree of symptoms, or their effects, that would justify a particular rating; the analysis should not be limited solely to whether a veteran exhibited the symptoms listed in the Rating Schedule. Rather, the determination should be based on all of a veteran's symptoms affecting his level of occupational and social impairment. See Mauerhan v. Principi, 16 Vet. App. 436, 442-43 (2002). The lists of symptoms under the Rating Schedule are meant to be examples of symptoms that would warrant the disability evaluation, but are not meant to be exhaustive. Id. 

After review of the evidence, both lay and medical, the Board finds that a rating of 50 percent under Diagnostic Code 9304 is warranted for dementia due to brain trauma for the entire appeal period prior to October 23, 2008, the date of the change in the relevant regulations. This rating is based on his reported symptoms of short-term memory loss, mild loss of attention and concentration, mild word-finding difficulties, mood swings, disturbances of motivation and mood, and difficulty in establishing and maintaining effective work and social relationships.

However, a rating in excess of 50 percent under Diagnostic Code 9304 is not warranted prior to October 23, 2008. The Veteran had been employed in his current position for 14 years and had good relationships with his wife, step-children, and friends. He had several hobbies and an active social life. He was employed in the same job. While he reported increased irritability starting in 2007, this did not include periods of violence or impaired impulse control as would be required for a rating in excess of 50 percent. For these reasons, a rating in excess of 50 percent under Diagnostic Code 9304 is not warranted prior to October 23, 2008.

As this change in the applicable Diagnostic Code from 8045 to 8045-9304 results in a higher rating, no prejudice to the Veteran could result from this change in the applicable diagnostic code. See Butts v. Brown, 5 Vet. App. 532, 538 (1993). 

Finally, neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366 , 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record). 

In summary, for the period prior to October 23, 2008, a 50 percent rating, but no higher, is warranted for residuals of TBI under DC 9304, applicable to dementia due to brain trauma. 



b. Increased Rating Claim for Residuals of TBI Subsequent to October 23, 2008

As explained above, the Veteran is in receipt of a 40 percent rating for residuals of a TBI from October 23, 2008 under 38 C.F.R. § 4.124a, Diagnostic Code 8045, applicable to residuals of TBI.

Under DC 8045, there are three main areas of dysfunction listed that may result from TBI and have profound effects on functioning: cognitive (which is common in varying degrees after TBI), emotional/behavioral, and physical. Each of these areas of dysfunction may require evaluation.

Cognitive impairment is defined as decreased memory, concentration, attention, and executive functions of the brain. Executive functions are goal setting, speed of information processing, planning, organizing, prioritizing, self-monitoring, problem solving, judgment, decision making, spontaneity, and flexibility in changing actions when they are not productive. Not all of these brain functions may be affected in a given individual with cognitive impairment, and some functions may be affected more severely than others. In a given individual, symptoms may fluctuate in severity from day to day. Adjudicators are to rate cognitive impairment under the table titled "Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified." Id. 

Subjective symptoms may be the only residual of TBI or may be associated with cognitive impairment or other areas of dysfunction. Adjudicators are to rate subjective symptoms that are residuals of TBI, whether or not they are part of cognitive impairment, under the subjective symptoms facet in the table titled "Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified." However, they are to separately rate any residual with a distinct diagnosis that may be rated under another Diagnostic Code, such as migraine headache or Meniere's disease, even if that diagnosis is based on subjective symptoms, rather than under the "Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified" table. Id. Therefore, as discussed herein, the Board has separately rated the Veteran's diagnosed nystagmus, seizure disorder with narcolepsy, visual field defect, craniotomy scar, left upper extremity weakness, and left lower extremity weakness. 

Adjudicators are to rate emotional/behavioral dysfunction under 38 C.F.R. § 4.130 (Schedule of ratings--mental disorders) when there is a diagnosis of a mental disorder. When there is no diagnosis of a mental disorder, they are to evaluate emotional/behavioral symptoms under the criteria in the table titled "Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified." Id. Here, the Veteran has a diagnosis of a mental disorder; therefore, such symptoms are evaluated separately under 38 C.F.R. § 4.130, DC 9433. 

Adjudicators are to rate physical (including neurological) dysfunction based on the following list, under an appropriate Diagnostic Code: Motor and sensory dysfunction, including pain, of the extremities and face; visual impairment; hearing loss and tinnitus; loss of sense of smell and taste; seizures; gait, coordination, and balance problems; speech and other communication difficulties, including aphasia and related disorders, and dysarthria; neurogenic bladder; neurogenic bowel; cranial nerve dysfunctions; autonomic nerve dysfunctions; and endocrine dysfunctions. Id.

The preceding list of types of physical dysfunction does not encompass all possible residuals of TBI. For residuals not listed here that are reported on an examination, adjudicators are to rate under the most appropriate Diagnostic Code. Adjudicators are to rate each condition separately, as long as the same signs and symptoms are not used to support more than one rating, and combine under § 4.25 the ratings for each separately rated condition. The rating assigned based on the "Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified" table will be considered the rating for a single condition for purposes of combining with other disability ratings. Id. 

The table titled "Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified" contains 10 important facets of TBI related to cognitive impairment and subjective symptoms. It provides criteria for levels of impairment for each facet, as appropriate, ranging from 0 to 3, and a 5th level, the highest level of impairment, labeled "total." However, not every facet has every level of severity. The Consciousness facet, for example, does not provide for an impairment level other than "total," since any level of impaired consciousness would be totally disabling. Adjudicators are to assign a 100-percent rating if "total" is the level of evaluation for one or more facets. If no facet is rated as "total," adjudicators are to assign the overall percentage rating based on the level of the highest facet as follows: 0 = 0 percent; 1 = 10 percent; 2 = 40 percent; and 3 = 70 percent. For example, assign a 70 percent rating if 3 is the highest level of evaluation for any facet. Id. 

The rating assigned is based upon the highest level of severity for any facet of cognitive impairment and other residuals of TBI not otherwise classified as determined on examination. Only one rating is assigned for all the applicable facets. A rating evaluation is not warranted unless a higher level of severity for a facet is established on examination. Physical and/or emotional/behavioral disabilities found on examination that are determined to be residuals of traumatic brain injury are rated separately.

Based on review of the evidence, lay and medical, the Board finds that, for the period from October 23, 2008, forward, the Veteran's memory, attention, concentration, and executive functions facet is assigned level "2" severity based objective evidence on testing of mild impairment of memory, attention, concentration, or executive functions resulting in mild functional impairment. This is based on the objective evidence of impairment in the April 2010 VA examination report.

A level of severity of "1" has been assigned for the Veteran's judgment facet based on a June 2009 VA neuropsychology testing consultation report indicated that the Veteran reported having reduced efficiency/planning, as well as a September 2009 VA treatment note indicating that the Veteran reported starting multiple projects at once and could not finish them because he became overwhelmed. 

A level of severity of "0" has been assigned for the Veteran's social interaction based on routinely appropriate social interaction. See April 2010, January 2013, and January 2015 VA examination reports.

A level of severity of "0" has been assigned for the Veteran's orientation facet based on the April 2010, January 2013, and May 2014 VA examiners' findings that the Veteran was oriented to person, time, place, and situation. See April 2010, January 2013, and May 2014 VA examination reports.

A level of severity of "1" has been assigned for motor activity (with intact motor and sensory system) based on the February 2013 VA TBI examiner's finding that the Veteran's motor activity was normal most of the time, but mildly slowed at times due to apraxia. See February 2013 VA examination report.

A level of severity of "0" has been assigned for the Veteran's normal visual spatial orientation. See February 2013 and January 2015 VA examination reports.

A level of severity of "1" has been assigned for subjective symptoms based on three or more subjective symptoms that mildly interfere with work; instrumental activities of daily living; or work, family, or other close relationships. Id. The February 2013 VA examiner noted that the Veteran had occasional dizziness, daily mild to moderate headaches, and blurred vision. The September 2013 VA eye examination report indicated that the Veteran had stable bilateral photosensitivity. Finally, the January 2015 and October 2016 VA examination reports reflected that the Veteran had non-prostrating headaches a few times a week.

The Board has assigned a level of severity of "1" for neurobehavioral effects based on the February 2013 VA examiner's finding of "one or more neurobehavioral effects that occasionally interfere with workplace interaction, social interaction, or both but do not preclude them." The Board notes that while the January 2015 VA examination report indicated that the Veteran had a neurobehavior effect in that the Veteran used to be more irritable and angry, but this was now better controlled by medication, the Board may not discount the effects of relief provided by medication when, as here, those effects are not specifically contemplated by the rating criteria. See Jones v. Shinseki, 26 Vet. App. 56, 62-63 (2012). However, the Veteran's symptoms of anger and irritability have been attributed to the Veteran's acquired psychiatric disorders and considered in assigning the separate rating for that disability. See October 2016 VA TBI examination report. 

A level of severity of "0" has been assigned for the Veteran's communication based on his ability to communicate by spoken and written language, and to comprehend spoken and written language. See April 2010, February 2013, and January 2015 VA examination reports.

Based on these assigned levels for each facet, the Board finds that the Veteran's residuals of TBI do not more nearly approximate a rating in excess of 40 percent for the rating period from October 23, 2008, forward. In this regard, the weight of the evidence indicates that level of severity "2" as the highest facet, thus warranting a 40 percent rating, but no higher. In so finding, the Board emphasizes that DC 8045 explicitly states that "symptoms [of cognitive impairment] may fluctuate in severity from day to day." For these reasons, the Board finds that the weight of the evidence is against a rating in excess of 40 percent for the period from October 23, 2008, forward, and the benefit-of-the-doubt doctrine is not applicable. See 38 U.S.C. 
§ 5107(b); 38 C.F.R. §§ 3.102, 4.3.

Finally, neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366 , 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record). 


c. Increased Rating for Acquired Psychiatric Disorders from 
October 23, 2008, Forward

The Veteran is in receipt of a 10 percent rating for dysthymic disorder and social phobia from January 9, 2008 to October 4, 2016, and a 30 percent rating thereafter, under 38 C.F.R. § 4.130, DC 9433, applicable to depressive disorder. He contends that higher ratings are warranted throughout the period on appeal.

As an initial matter, the Board awarded herein a 50 percent rating for residuals of TBI under 38 C.F.R. § 4.130, DC 9304, applicable to dementia due to brain trauma for the period prior to October 23, 2008. As the Veteran's psychiatric symptoms prior to October 23, 2008 have already been considered in the rating granted under DC 9304, no separate rating is warranted under DC 9433 prior to October 23, 2008. 38 C.F.R. § 4.14. Thus, the Board will only address here the Veteran's claim for an increased rating for an acquired psychiatric disorder from October 23, 2008, forward. 

All psychiatric disabilities are evaluated under a general rating formula for mental disorders, as described above. 

Based on a review of the evidence, lay and medical, the Board finds that a rating of 70 percent is warranted for an acquired psychiatric disorder for the entire period from October 23, 2008, forward. This rating is based on evidence of short-term memory loss, loss of attention and concentration, word-finding difficulties, mood swings, disturbances of motivation and mood, anxiety with frequent panic attacks, impaired impulse control, difficulty in adapting to stressful circumstances, compulsive behaviors, and difficulty in establishing and maintaining effective work and social relationships. The Board notes that the increase in rating is warranted from October 23, 2008, forward, based in large part due to the onset of compulsive checking behaviors and frequent panic attacks that were first reported in the May 2009 VA examination report. The Board finds that the Veteran's compulsive checking behavior was analogous to an obsessional ritual, and that such compulsions clearly interfered with his routine activities, as the Veteran described during the May 2009 VA examination having to stop what he was doing and check his alarm clock if he remembered that he had not previously done so. In addition, the Veteran reported having frequent panic attacks, often pertaining to anxiety about arriving at appointments late, such that he arrived two hours early for his VA examination for fear that he would be late. 

However, a rating in excess of 70 percent is not warranted for the period from October 23, 2008, forward, as the Veteran's acquired psychiatric disorders did not manifest in gross impairment in thought processes or communication, persistent delusions or hallucinations, grossly inappropriate behavior, persistent danger of hurting self or others, intermittent inability to perform ADLs, disorientation to time or place, or memory loss of names of close relatives, own occupation, or own name. In addition, the Board notes that despite the Veteran's documented social and occupational impairment due to his acquired psychiatric disorders, he was employed in the same job in a supervisory role for more than 28 years and was promoted during the pendency of this appeal. For these reasons, a rating in excess of 70 percent for the acquired psychiatric disorders is not warranted from October 23, 2008, forward.

Finally, neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366 , 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record). 

d. Increased Rating for a Seizure Disorder with Narcolepsy

The Veteran is in receipt of a 20 percent rating for a posttraumatic seizure disorder with narcolepsy, as a residual of TBI, under 38 C.F.R. §§ 4.124a, Diagnostic Codes 8999-8914. 

Hyphenated diagnostic codes are used when a rating under one code requires use of an additional diagnostic code to identify the basis for the evaluation assigned. 38 C.F.R. § 4.27. When an unlisted condition is encountered, it is permissible to rate under a closely related disease or injury in which not only the functions affected, but the anatomical localization and symptomatology are closely analogous. 38 C.F.R. § 4.20. According to the policy in the Rating Schedule, when a disability is not specifically listed, the diagnostic code will be "built up," meaning that the first 2 digits will be selected from that part of the schedule most closely identifying the part of the body involved, and the last 2 digits will be "99." 38 C.F.R. § 4.27. For example, DC 8999 is used to identify unlisted epilepsies. 

This rating has been in effect since February 1985, and is therefore protected under the law preserving disability ratings in effect for more than 20 years. 38 C.F.R. 
§ 3.951(b). As noted above, the RO in November 2016 granted service connection for narcolepsy, effective December 11, 2013, and rated it as part of the seizure disorder. The combination of these disabilities for rating purposes was proper, as Diagnostic Code 8108, applicable to narcolepsy, directs that narcolepsy should be rated as for petit mal epilepsy under Diagnostic Code 8911, which is rated under the General Rating Formula for Minor Seizures. Therefore, the Board will consider symptoms of both the narcolepsy and seizure disorder in determining whether a rating in excess of 20 percent is warranted. 

Prior to October 23, 2008, Diagnostic Code 8045 provided that purely neurological disabilities such as seizures, following trauma to the brain, will be rated under the diagnostic codes specifically dealing with such disabilities, with citation of a hyphenated diagnostic code (e.g., 8045-8911). After October 23, 2008, Diagnostic Code 8045 provided that any residual with a distinct diagnosis that may be rated under another Diagnostic Code, such as seizures, should be separately rated, even if that diagnosis is based on subjective symptoms, rather than under the "Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified" table. Id. Therefore, the seizure disorder, as a residual of TBI, has been properly rated separately for the entire period on appeal.

Under Diagnostic Code 8914, psychomotor epilepsy is to be rated based on major or minor seizures under the General Rating Formula for Major and Minor Epileptic Seizures. Psychomotor seizures will be rated as "major seizures" when characterized by automatic states and/or generalized convulsions with unconsciousness. Psychomotor seizures will be rated as "minor seizures" when characterized by brief transient episodes of random motor movements, hallucinations, perceptual illusions, abnormalities of thinking, memory or mood, or autonomic disturbances. See 38 C.F.R. § 4.124a, Diagnostic Code 8914. 38 C.F.R. § 4.122 further describes the characteristics of psychomotor epilepsy.

Under the General Rating Formula for Major and Minor Epileptic Seizures, a 20 percent evaluation is assigned when there is at least 1 major seizure in the last 2 years, or at least 2 minor seizures in the last six months. A 40 percent evaluation is assigned when there is at least 1 major seizure in the last six months or 2 in the last year, or averaging at least 5 to 8 minor seizures weekly. A 60 percent evaluation is assigned when there is an average of at least 1 major seizure in 4 months over the last year, or 9 to 10 minor seizures per week. An 80 percent evaluation is assigned when there is an average of at least 1 major seizure in 3 months over the last year, or more than 10 minor seizures weekly. A 100 percent evaluation is assigned when there is an average of at least 1 major seizure per month over the last year. 
38 C.F.R. § 4.124a.

Based on a review of the evidence, both lay and medical, the Board finds that prior to August 13, 2010, a rating in excess of 20 percent for a seizure disorder with epilepsy is not warranted. During this period, the Veteran consistently reported having no major seizures and less than five seizures per week. In September 2003, he reported having one to two seizures per month. During the November 2006 VA examination, the Veteran reported having 10 seizure episodes in the past 12 months, which was a reduction from the previous two to three times per month. In March 2007, he reported having two seizures over the prior three months. In May 2009, the Veteran reported getting an aura three to four times a month and four to five true seizures over the past year. In September 2009, the Veteran reported having two seizure episodes monthly for years. For these reasons, the weight of the evidence supports a finding that a rating in excess of 20 percent for the Veteran's seizure disorder with narcolepsy is not warranted prior to August 13, 2010.

However, an August 13, 2010 VA neurology treatment note indicated that the Veteran experienced his seizures as episodes of paresthesias in a band-like sensation around his head that were consistent with his prior seizure auras. These auras occurred several times a week if he was driving a great deal. While the December 2012 VA seizures disorders examination report indicated that the Veteran had not had a seizure in many months, this appears to only refer to true seizures and not the narcolepsy. A December 2012 VA neurology treatment note indicated that the Veteran was having head paresthesias while driving almost daily. Based on this evidence of almost daily minor seizures and no major seizures, the Board finds that a 40 percent rating, but no higher, is warranted for the Veteran's seizure disorder with narcolepsy from August 13, 2010 to October 2, 2013. 

Furthermore, the Board finds that an 80 percent rating for the Veteran's seizure disorder with narcolepsy is warranted from October 3, 2013 to April 28, 2016, based on symptoms of more than 10 minor seizures weekly. Evidence in support of this finding is the October 2013 VA discharge summary indicating that the Veteran was having these narcoleptic episodes every day while driving, occurring twice a day. Based on this evidence of twice daily minor seizures and no major seizures, the Board finds that an 80 percent rating, but no higher, is warranted for the Veteran's seizure disorder with narcolepsy from October 3, 2013 to April 28, 2016.

Finally, the Board finds that a rating of 20 percent is warranted for the Veteran's seizure disorder with narcolepsy from April 29, 2016, forward. Evidence in support of this finding includes an April 2016 VA neurology treatment note indicating that the Veteran had infrequent seizures, with the last episode two months prior, would sometimes fall asleep at his desk at work, and still felt persistently tired throughout the day. In addition, the October 2016 VA narcolepsy examination report indicated that the Veteran had zero to one narcoleptic episodes over the past six months. Based on this evidence, and resolving all reasonable doubt in the Veteran's favor, the Board finds that the Veteran was typically having at least two minor seizures in the past six months, but less than five weekly minor seizures and no major seizures, such that a rating of 20 percent, but no higher, is warranted for the Veteran's seizure disorder with narcolepsy from April 29, 2016, forward.

Finally, neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366 , 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record). 




e. Increased Rating Claim for Left Upper Extremity Weakness

The Veteran is in receipt of a noncompensable rating for left upper extremity weakness, as a residual of TBI, from August 3, 2000 to August 7, 2003, and a 30 percent rating thereafter, under Diagnostic Code 8512, applicable to paralysis of the upper radicular group. The Veteran contends that a higher rating is warranted.

As an initial matter, the Board notes that the Veteran's left upper extremity weakness is a symptom of hemiplegia, which is a residual of TBI. See January 2015 VA examination report. As such, it is a separately diagnosed neurological disability and is properly rated separately from the residuals of TBI under DC 8045 both before and after the October 23, 2008 change in the applicable regulations. 

The Veteran is right-handed; therefore, ratings of his upper left extremity are those of the minor extremity.

Diagnostic Code 8512 provides a 20 percent rating for mild incomplete paralysis of the minor extremity, a 30 percent rating for moderate incomplete paralysis of the minor extremity, and a 40 percent rating for severe incomplete paralysis of the minor extremity. Where there is complete paralysis, as manifested by all intrinsic muscles of the hand and some or all of flexors of the wrist and fingers, paralyzed (substantial loss of use of hand), a 60 percent rating is assigned for the minor extremity. 38 C.F.R. § 4.124a.

The words "mild," "moderate," and "severe" are not defined in the Rating Schedule. Rather than applying a mechanical formula, the Board must evaluate all of the evidence to the end that its decisions are "equitable and just." 38 C.F.R. § 4.6. It should also be noted that use of terminology such as "mild" and "moderate" by VA examiners or other physicians, although an element of evidence to be considered by the Board, is not dispositive of an issue. All evidence must be evaluated in arriving at a decision regarding an increased rating. 38 C.F.R. §§ 4.2, 4.6.

Based on a review of the evidence, lay and medical, the Board finds that a rating of 30 percent, but no higher, is warranted for the entire period on appeal. This is based on the extensive evidence, including the September 2003, May 2009, and December 2012 VA examination reports, indicating that the Veteran's left upper extremity weakness has been characterized by consistent symptoms throughout the period on appeal. However, a rating in excess of 30 percent is not warranted as the Veteran's symptoms were no more than moderate in severity. This is based on The July 2007 VA examination report indicating that the Veteran was unable to participate in sports and had difficulty working with his hands due to his left-sided weakness. He had moderately decreased strength (4/5) in his left upper extremity, as well as hyperactive deep tendon reflexes. See May 2009 and December 2012 VA examination reports. His symptoms are no more than moderate. Therefore, a rating in excess of 30 percent for left upper extremity weakness is not warranted for the entire period on appeal.

Finally, neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366 , 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record). 

f. Increased Rating Claim for Left Lower Extremity Weakness

The Veteran is in receipt of a 20 percent rating for left lower extremity weakness as a residual of TBI from January 9, 2008, under Diagnostic Code 8520, applicable to paralysis of the sciatic nerve. The Veteran contends that a higher rating is warranted.

As an initial matter, the Board notes that the Veteran's left lower extremity weakness is a symptom of hemiplegia, which is a residual of TBI. See January 2015 VA examination report. As such, it is a neurological disability and is properly rated separately from the residuals of TBI under DC 8045 both before and after the October 23, 2008 change in the applicable regulations. 

Under DC 8520, an 80 percent disability rating is assigned for complete paralysis of the sciatic nerve, demonstrated by foot drop, no active movement possible of the muscles below the knee, and knee flexion that is weakened or (very rarely) lost. Lower disability ratings are provided for incomplete paralysis, defined by the Rating Schedule as "a degree of lost or impaired function substantially less than the type picture for complete paralysis given." A 60 percent disability rating is assigned for severe, incomplete paralysis, with marked muscular atrophy. A 40 percent disability rating is assigned for moderately severe, incomplete paralysis. A 20 percent disability rating is assigned for moderate, incomplete paralysis. A 10 percent disability rating is assigned for mild, incomplete paralysis. 38 C.F.R. 
§ 4.124a, DC 8520.

The words "mild," "moderate," and "severe" are not defined in the Rating Schedule. Rather than applying a mechanical formula, the Board must evaluate all of the evidence to the end that its decisions are "equitable and just." 38 C.F.R. § 4.6. It should also be noted that use of terminology such as "mild" and "moderate" by VA examiners or other physicians, although an element of evidence to be considered by the Board, is not dispositive of an issue. All evidence must be evaluated in arriving at a decision regarding an increased rating. 38 C.F.R. §§ 4.2, 4.6.

Based on a review of the evidence, lay and medical, the Board finds that a rating of 40 percent, but no higher, is warranted for the entire period on appeal. This is based on the extensive evidence, including the September 2003, May 2009, and December 2012 VA examination reports, indicating that the Veteran's left lower extremity weakness has been characterized by consistent symptoms throughout the period on appeal. The Veteran's muscle strength, motor function, and deep tendon reflexes of the left lower extremity have been decreased throughout the period on appeal, and this resulted in an abnormal gait, favoring the left lower extremity and with mild spasticity on the left side and decreased toe and heel walk on the left. In addition, the December 2012 VA seizure disorders examination report indicated that the Veteran had fallen nine times in the last year due to left lower extremity weakness. Finally, the February 2013 VA TBI examination report indicated that the Veteran also had left lower extremity numbness. These symptoms are consistent with moderately severe impairment, but do not reflect severe or complete impairment, as the Veteran was still able to perform all ADLs and IADLS and work independently. For these reasons, and resolving all reasonable doubt in the Veteran's favor, the Board finds that a rating of 40 percent, but no higher, is warranted based on moderately severe left lower extremity weakness, and related functional impairment, throughout the period on appeal. 

Finally, neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366 , 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record). 


g. Entitlement to a Separate Compensable Rating for a Left Hip Disability Prior to January 9, 2008, and in Excess of 10 Percent Thereafter

The Veteran is in receipt of a 10 percent rating for a left hip disability, effective January 9, 2008, under 38 C.F.R. § 4.71a, Diagnostic Code 5024, applicable to tenosynovitis.

As an initial matter, the Board finds that the Veteran does not have a diagnosis of tenosynovitis of the left hip. Therefore, the assignment of Diagnostic Code 5024 is not proper. Instead, the Board considered the diagnostic codes related to the hips, specifically Diagnostic Codes 5250-5255, to determine the appropriate code to assign for the left hip disability. As there is no evidence of ankylosis, limitation of extension to five degrees, hip flail joint, or impairment of the femur, Diagnostic Codes 5250, 5251, 5254, and 5255 are not for application. In addition, there was no evidence of limitation of abduction with motion lost beyond 10 degrees, limitation of adduction such that the Veteran could not cross his legs, or limitation or rotation such that the Veteran could not toe-out more than 15 degrees; therefore, Diagnostic Code 5253 is not for application.

Based on the Veteran's demonstrated limitation of flexion and painful flexion, the Board finds that Diagnostic Code 5252, applicable to limitation of flexion is most appropriate for rating the Veteran's left hip disability. See Butts v. Brown, 5 Vet. App. 532, 538 (1993); Pernorio v. Derwinski, 2 Vet. App. 625, 629 (1992).

Under Diagnostic Code 5252, a noncompensable disability evaluation is assigned for flexion of the thigh greater than 45 degrees and a 10 percent disability evaluation is assigned for flexion of the thigh limited to 45 degrees. For a 20 percent evaluation, there must be limitation of flexion to 30 degrees. For a 30 percent evaluation, there must be limitation of flexion to 20 degrees. A 40 percent rating requires flexion limited to 10 degrees. 38 C.F.R. § 4.71(a), DC 5252.

In evaluating disabilities of the musculoskeletal system, painful motion is an important factor of disability. See 38 C.F.R. § 4.59. The intent of the schedule is to recognize painful motion with joint or particular pathology as productive of disability. Id. Joints that are actually painful, unstable, or malaligned, due to healed injury, should be entitled to at least the minimum compensable rating for the joint. Id. Special note should be taken of objective indications of pain on pressure or manipulation, muscle spasm, crepitation, and active and passive range of motion of both the damaged joint and the opposite undamaged joint. Id.; see also Burton v. Shinseki, 25 Vet. App. 1 (2011) (holding that section 4.59 applies to all forms of painful motion of joints, and not just to arthritis). 

When evaluating musculoskeletal disabilities based on limitation of motion, 38 C.F.R. § 4.40 requires consideration of functional loss caused by pain or other factors listed in that section that could occur during flare-ups or after repeated use and, therefore, not be reflected on range-of-motion testing. 38 C.F.R. § 4.45 requires consideration also be given to less movement than normal, more movement than normal, weakened movement, excess fatigability, incoordination, and pain on movement. See DeLuca v. Brown, 8 Vet. App. 202 (1995); see also Mitchell v. Shinseki, 25 Vet. App. 32, 44 (2011). Nonetheless, even when the background factors listed in § 4.40 or 4.45 are relevant when evaluating a disability, the rating is assigned based on the extent to which motion is limited, pursuant to 38 C.F.R. § 4.71a (musculoskeletal system) or § 4.73 (muscle injury); a separate or higher rating under § 4.40 or 4.45 itself is not appropriate. See Thompson v. McDonald, 815 F.3d 781, 785 (Fed. Cir. 2016) ("[I]t is clear that the guidance of § 4.40 is intended to be used in understanding the nature of the veteran's disability, after which a rating is determined based on the § 4.71a [or 4.73] criteria.").

After review of the evidence, lay and medical, the Board finds that a 10 percent rating, but no higher, is warranted for the entire period on appeal based on evidence of painful motion of the left hip. In support of this finding, the Board notes that the Veteran has consistently reported experiencing left hip pain which the September 2003 VA treatment note indicated was likely exacerbated by his TBI, including the residual left lower extremity weakness. However, left hip flexion has been no worse than 80 degrees, with pain at 60 degrees. See November 2006 and May 2009 VA examination reports. As such, the minimum compensable rating of 10 percent is warranted under DC 5252 for painful motion of the left hip. 38 C.F.R. § 4.59. To the extent that the Veteran has had symptoms of limitation of function and an abnormal gait, the Board notes that these functional impairments and symptoms are contemplated by the separate rating currently assigned under Diagnostic Code 8512 for left lower extremity weakness. For these reasons, and resolving all reasonable doubt in favor of the Veteran, a rating of 10 percent, but no higher, is warranted under DC 5252 for painful motion of the left hip for the entire period on appeal.

Finally, neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366 , 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record). 


h. Increased Rating Claim for Nystagmus

The Veteran is in receipt of a 10 percent rating for central nystagmus as a residual of TBI under 38 C.F.R. §§ 4.79, 4.124a, DCs 8045-6016. 

Diagnostic Code 6016 provides a 10 percent rating for nystagmus, central. No other rating is provided by this code. Nystagmus is the involuntary, rapid, rhythmic movement of the eyeball, which may be horizontal, vertical, rotary, or mixed. See Dorland's Illustrated Medical Dictionary 1296 (30th ed. 2003).

The Veteran is receiving the maximum schedular rating under DC 6016 and therefore cannot receive a higher one. As the Veteran is receiving the maximum schedular rating, a schedular rating higher than 10 percent for his nystagmus disability is not warranted. See 38 C.F.R. §§ 4.79, 4.124a, DCs 8045-6016. 

Finally, neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).


i. Increased Rating Claim for a Visual Field Defect

The Veteran is in receipt of a 10 percent initial rating, effective July 2, 2009, for a visual field defect, as a residual of TBI, under 38 C.F.R. § 4.79, DCs 6066-6080, applicable to impairment of visual acuity and visual field defects. He contends that a higher rating is warranted.

The rating criteria contemplating diseases of the eye direct the rater to rate the disability on the basis of either visual impairment due to the particular condition or on incapacitating episodes, whichever results in a higher rating. 38 C.F.R. § 4.79, Diagnostic Codes 6000-6009. The evidence does not show, nor has the Veteran asserted, that he has had incapacitating episodes related to his visual field defect during the rating period; and the rating criteria pertaining to such are thus not for application in the present appeal. Id.

In addition, there is no evidence of tuberculosis, retinal scars, neoplasms, conjunctivitis, ptosis, ectropion, entropion, lagophthalmos, loss of eyebrows, lids, or lashes, lacrimal apparatus disorders, aphakia, paralysis, or keratoconus. Thus, the rating criteria contemplating such disabilities are not for application. See 38 C.F.R. § 4.79, Diagnostic Codes 6010, 6011, 6014-6015, 6017-6026, 6030, 6032, and 6035.

The Board also notes that the Veteran has not been diagnosed with glaucoma with associated impairment of visual fields, cataracts, or pterygium. See 38 C.F.R. 
§ 4.79, Diagnostic Codes 6012, 6013, 6027, and 6036. 

The evidence also does not show anatomical loss of both eyes, no more than light perception in both eyes, anatomical loss of one eye, and/or no more than light perception in one eye during the rating period. Therefore, the rating criteria contemplating impairment of central visual acuity for such conditions are not for application. 38 C.F.R. § 4.79, Diagnostic Codes 6061-6064. Furthermore, Diagnostic Code 6065, contemplating impairment of central visual acuity with vision in one eye at 5/200, is not applicable, as there is no evidence that the Veteran had such limitation in either eye during the rating period. 38 C.F.R. § 4.79, Diagnostic Code 6065.

Diagnostic Codes 6066 and 6080, which contemplate impairment of central visual acuity with vision in one eye at 10/200 or better and impairment of visual fields, are the most appropriate rating criterion in the present appeal. 

Central visual acuity is to be rated on the basis of corrected distance vision with central fixation. 38 C.F.R. § 4.76(b). Under Diagnostic Code 6066, a 10 percent rating is warranted for impairment of central visual acuity when corrected visual acuity is: (1) 20/100 in one eye and 20/40 in the other eye; (2) 20/70 in one eye and 20/40 in the other eye; (3) 20/50 in one eye and 20/40 in the other eye; or (4) 20/50 in both eyes. A 20 percent rating is warranted for impairment of central visual acuity when corrected visual acuity is: (1) 15/200 in one eye and 20/40 in the other eye; (2) 20/200 in one eye and 20/40 in the other eye; (3) 20/100 in one eye and 20/50 in the other eye; or (4) 20/70 in one eye and 20/50 in the other eye. Id. Higher ratings are provided under Diagnostic Code 6066 for higher levels of impairment of central visual acuity up to a maximum 90 percent rating when vision is 10/200 in both eyes. Id.

Visual field defects are rated under Diagnostic Code 6080. Under this code, concentric contraction of visual field to 5 degrees warrants a 100 percent disability rating for bilateral loss, a 30 percent disability rating for unilateral loss, or is rated as 5/200 (1.5/60); concentric contraction of visual field to 15 degrees, but not to 5 degrees, warrants a 70 percent disability rating for bilateral loss, a 20 percent disability rating for unilateral loss, or is rated as 20/200 (6/60); concentric contraction of visual field to 30 degrees, but not to 15 degrees, warrants a 50 percent disability rating for bilateral loss, a 10 percent disability rating for unilateral loss, or is rated as 20/100 (6/30); concentric contraction of visual field to 45 degrees, but not to 30 degrees, warrants a 30 percent disability rating for bilateral loss, a 10 percent disability rating for unilateral loss, or is rated as 20/70 (6/21); concentric contraction of visual field to 60 degrees, but not to 45 degrees, warrants a 20 percent disability rating for bilateral loss, a 10 percent disability rating for unilateral loss, or is rated as 20/50 (6/15). Bilateral loss of the temporal half of the visual field warrants a 30 percent disability rating, unilateral loss warrants a 10 percent disability rating, or is rated as 20/70 (6/21). Bilateral loss of the nasal half of the visual field warrants a 20 percent disability rating, unilateral warrants a 10 percent disability rating, or is rated as 20/50 (6/15). 38 C.F.R. § 4.84a, Diagnostic Code 6080(2017).

The extent of contraction of visual field in each eye is determined by recording the extent of the remaining visual fields in each of the eight 45-degree principal meridians. The number of degrees lost is determined at each meridian by subtracting the remaining degrees from the normal visual fields given in Table III. The degrees lost are then added together to determine total degrees lost. This is subtracted from 500. The difference represents the total remaining degrees of visual field. The difference divided by eight represents the average contraction for rating purposes. 38 C.F.R. § 4.76a (2017).

Normal visual field extant at eight principle meridians is as follows: temporally is 85 degrees, down temporally is 85 degrees, down is 65 degrees, down nasally is 50 degrees, up nasally is 55 degrees, up is 45 degrees, and up temporally is 55 degrees. 38 C.F.R. § 4.76a, Table III.

Based on review of the evidence, lay and medical, the Board finds that a rating in excess of 10 percent is not warranted for the visual field defect for the entire period on appeal. The only visual field measurements of record are in the September 2013 VA examination report that indicated average concentric contraction of 52.375 in the right eye and 51.625 degrees in the left eye. Both the April 2010 and September 2013 VA eye examination reports indicated that corrected visual acuity was 20/40 or better, bilaterally. Therefore, the Board finds that the weight of the evidence supports a finding that a rating in excess of 10 percent for impaired visual acuity and a visual field defect is not warranted. As the preponderance of the evidence is against the claim, the benefit of the doubt doctrine is not for application. 38 U.S.C. § 5107(b); 38 C.F.R. § 4.3.

Finally, neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).


j. Increased Rating Claim for a Craniotomy Scar

The Veteran is in receipt of a noncompensable rating for a craniotomy scar prior to December 27, 2011, and a 10 percent rating thereafter, under 38 C.F.R. § 4.118, DC 7800, applicable to scars of the head, face, or neck. He contends that higher ratings are warranted for the entire period on appeal.

DC 7800 provides that a skin disorder with one characteristic of disfigurement of the head, face, or neck be rated 10 percent disabling. A skin disorder of the head, face, or neck with visible or palpable tissue loss and either gross distortion or asymmetry of one feature or paired set of features (nose, chin, forehead, eyes (including eyelids), ears (auricles), cheeks, lips), or; with two or three characteristics of disfigurement, is rated 30 percent disabling. A skin disorder of the head, face, or neck with visible or palpable tissue loss and either gross distortion or asymmetry of two features or paired sets of features (nose, chin, forehead, eyes (including eyelids), ears (auricles), cheeks, lips), or; with four or five characteristics of disfigurement, is rated 50 percent disabling A skin disorder of the head, face, or neck with visible or palpable tissue loss and either gross distortion or asymmetry of three or more features or paired sets of features (nose, chin, forehead, eyes (including eyelids), ears (auricles), cheeks, lips), or; with six or more characteristics of disfigurement, is rated 80 percent disabling. 

Note (1) to DC 7800 provides that the 8 characteristics of disfigurement, for purposes of rating under 38 C.F.R. § 4.118, are: (A) Scar is 5 or more inches (13 or more cm.) in length; (B) Scar is at least one-quarter inch (0.6 cm.) wide at the widest part; (C) Surface contour of scar is elevated or depressed on palpation; (D) Scar is adherent to underlying tissue; (E) Skin is hypo-or hyper-pigmented in an area exceeding six square inches (39 sq. cm.);(F) Skin texture is abnormal (irregular, atrophic, shiny, scaly, etc.) in an area exceeding six square inches (39 sq. cm.); (G) Underlying soft tissue is missing in an area exceeding six square inches (39 sq. cm.); and (H) Skin is indurated and inflexible in an area exceeding six square inches (39 sq. cm.). 

Diagnostic Codes 7801 and 7802 rate scars not of the head, face, or neck, and do not apply in this case as the craniotomy scar is located on the head. 38 C.F.R. 
§ 4.118.

Under DC 7804, a 10 percent rating is warranted for 1 or 2 scars that are unstable or painful. A 20 percent rating is warranted for 3 to 4 scars that are unstable or painful. A 30 percent disability rating is warranted for 5 or more scars that are unstable or painful. Note (1) states that an unstable scar is one where, for any reason, there is frequent loss of covering of skin over the scar. Note (2) provides that if one or more scars are both unstable and painful, add 10 percent to the evaluation that is based on the total number of unstable or painful scars. Id.

DC 7805 provides that other scars (not otherwise considered under the DCs 7800 -7804) are to be rated according to their disabling effects under an appropriate diagnostic code. See 38 C.F.R. § 4.118, DC 7805.

Upon review of the evidence of record, the Board finds that a rating of 10 percent, but no higher, is warranted under DC 7800 for the entire period on appeal, based on the presence of one character of disfigurement, specifically, skin hypo-pigmented in an area exceeding 39 square centimeters. See September 2013 VA examination report. 

In addition, a separate 10 percent rating is warranted under DC 7804 for a single painful craniotomy scar. However, as there is only one painful scar and no unstable scars, a rating in excess of 10 percent under DC 7804 is not warranted. 

Finally, the evidence of record does not indicate that the Veteran's craniotomy scar is productive of limitation of function; therefore, a compensable rating is not warranted under DC 7805. 

Finally, the Board notes that neither the Veteran nor his attorney has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).

In summary, after considering all of the applicable diagnostic codes, and resolving all reasonable doubt in the Veteran's favor, the Board finds that the evidence supports the assignment of 10 percent rating, but no higher, under DC 7800 for a head scar with one characteristic of disfigurement, for the entire period on appeal. In addition, a separate 10 percent rating is warranted under DC 7804 for a single painful craniotomy scar, for the entire period on appeal. However, a compensable rating is not warranted for scars under DC 7805.

Finally, neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).




k. Increased Rating Claim for Headaches

The Veteran is in receipt of a noncompensable rating for post-concussive headaches and localized neuritic head pain at the site of the craniotomy under 38 C.F.R. 
§ 4.124a, DC 8100, applicable to migraine headaches. 

As an initial matter, the Board notes that the Veteran's headaches are contemplated by his 40 percent rating under DC 8045 for residuals of TBI and the localized neuritic head pain at the site of the craniotomy is contemplated by the 10 percent rating awarded herein for a painful craniotomy scar. 

The evaluation of the same manifestations under different diagnoses, or "pyramiding", is precluded by 38 C.F.R. § 4.14. A claimant may not be compensated twice for the same symptomatology as "such a result would overcompensate the claimant for the actual impairment of earning capacity." Brady v. Brown, 4 Vet. App. 203, 206 (1993). Separate ratings may be granted only when "none of the symptomatology for any one of [the claimed conditions] is duplicative of or overlapping with the symptomatology of the other ... conditions." Esteban v. Brown, 6 Vet. App. 259 (1994).

Nonetheless, a separate rating under 38 CFR § 4.124a, DC 8100 for a distinct comorbid diagnosis of migraine headaches or localized neuritic head pain is permitted as long as the manifestations do not overlap with those used to assign the evaluation of TBI under 38 CFR § 4.124a, DC 8045, or the evaluation of the painful scar under 38 C.F.R. § 4.118, DC 7804. See VA's Adjudication Procedure Manual (M21-1), Part III, Subpart iv, Chapter 4, Section G, Subsection 2.h. 

Under DC 8100, a 50 percent rating is warranted with very frequent, completely prostrating, and prolonged attacks productive of severe economic inadaptability. A 30 percent evaluation is warranted with characteristic prostrating attacks occurring on an average once a month, over the preceding several months. A 10 percent evaluation is warranted with characteristic prostrating attacks averaging once per two months, over the preceding several months. A noncompensable rating is warranted with less frequent attacks. 38 C.F.R. § 4.124a.

The Rating Schedule does not define "prostrating," nor has the Court. See Fenderson v. West, 12 Vet. App. 119 (1999) (quoting DC 8100verbatim, but not specifically addressing the matter of what is a prostrating attack). By way of reference, "prostration" is defined as "extreme exhaustion or powerlessness." See Dorland's Illustrated Medical Dictionary 1531 (32nd ed. 2012). Similarly, "prostrate" is defined as "physically or emotionally exhausted; incapacitated." See Webster's II New College Dictionary 889 (2001). 

Further, "severe economic inadaptability" is also not defined in VA law. See Pierce v. Principi, 18 Vet. App. 440, 446 (2004). In addition, the Court has held that nothing in DC 8100 requires that the claimant be completely unable to work in order to qualify for a 50 percent rating. Id. In this regard, it was explained by the Court that if "economic inadaptability" were read to import unemployability, the appellant, should he or she meet the economic-inadaptability criterion, would then be eligible for a TDIU rather than just a 50 percent rating. Id., citing 38 C.F.R. 
§ 4.16. The Court discussed the notion that consideration must also be given as to whether the disability was capable of producing severe economic inadaptability, regardless of whether the condition was actually causing such inadaptability. See Pierce, 18 Vet. App. at 446. In this regard, VA conceded that the words "productive of" could be read to mean either "producing" or "capable of producing." Id. at 446-447.

Based on review of the evidence, lay and medical, the Board finds that a compensable rating is not warranted for the Veteran's headaches under DC 8100, as the evidence has consistently indicated that his headaches are not prostrating. See March 2007, February 2013, January 2015, and October 2016 VA examination reports. In addition, the Veteran has not contended that his headaches are prostrating. As such, a compensable rating for migraine headaches under DC 8100 is not warranted. In addition, there is no evidence to support a compensable rating under DC 8100 for localized neuritic head pain, as such pain is also not prostrating. 

For these reasons, the Board finds that, to the extent that the symptoms of the Veteran's headaches and localized neuritic head pain do not overlap with those subjective symptoms which are part of his TBI and painful scar, the weight of the evidence is against a separate compensable rating for post-concussive headaches and localized neuritic head pain at the site of the craniotomy under DC 8100, as the criteria for a compensable 10 percent rating are not met. As the preponderance of the evidence is against the claim, the benefit of the doubt doctrine is not for application. 38 U.S.C. § 5107(b); 38 C.F.R. § 4.3. 

Finally, neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 69-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).

ORDER

The reduction of rating for TBI from 40 percent to non-compensable (0 percent), effective October 12, 2016, was improper, and 40 percent rating is restored, effective October 12, 2016. The reduction appeal is granted.

Prior to October 23, 2008, a 50 percent rating for dementia due to brain trauma is granted, subject to controlling regulations governing the payment of monetary awards.

From October 23, 2008, a rating in excess of 40 percent for residuals of TBI is denied.

From October 23, 2008, forward, a rating of 70 percent, but no higher, for acquired psychiatric disorders is granted, subject to controlling regulations governing the payment of monetary awards.

Prior to August 13, 2010, a rating in excess of 20 percent for a seizure disorder with narcolepsy, as a residual of TBI, is denied.

From August 13, 2010 to October 2, 2013, a rating of 40 percent, but no higher, for a seizure disorder with narcolepsy, as a residual of TBI, is granted, subject to controlling regulations governing the payment of monetary awards.

From October 3, 2013 to April 28, 2016, a rating of 80 percent, but no higher, for a seizure disorder with narcolepsy, as a residual of TBI, is granted, subject to controlling regulations governing the payment of monetary awards.

From April 29, 2016, forward, a rating of 20 percent, but no higher, for a seizure disorder with narcolepsy, as a residual of TBI, is granted, subject to controlling regulations governing the payment of monetary awards.

Prior to August 8, 2003, a rating of 30 percent, but no higher, for left upper extremity weakness, as a residual of TBI, is granted, subject to controlling regulations governing the payment of monetary awards.

From August 8, 2003, a rating in excess of 30 percent for left upper extremity weakness, as a residual of TBI, is denied.

For the entire period on appeal, a rating of 40 percent, but no higher, for left lower extremity weakness, as a residual of TBI, is granted, subject to controlling regulations governing the payment of monetary awards.

Prior to January 9, 2008, a rating of 10 percent, but no higher, for a left hip disability, as a residual of TBI, is granted, subject to controlling regulations governing the payment of monetary awards.

From January 9, 2008, forward, a rating in excess of 10 percent for a left hip disability, as a residual of TBI, is denied.

A rating in excess of 10 percent for nystagmus, as a residual of TBI, is denied. 

An initial rating in excess of 10 percent for a visual field defect, as a residual of TBI, is denied.

An initial compensable rating for headaches and localized neuritic head pain, as a residual of TBI, is denied.




______________________________________________
S. B. MAYS
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs